**CITIGROUP INC. and Citicorp., Plaintiffs,**

v.

**CITY HOLDING COMPANY and City National Bank of West Virginia, Defendants.**

**No. 99 Civ. 10115(RWS).**

United States District Court, S.D. New York.

May 31, 2000.

---

Skadden, Arps, Slate, Meagher & Flom, New York, NY (Kenneth A. Plevan, Stephanie J. Kamerow, Bruce J. Goldner, Of Counsel), for Plaintiffs.

Fitzpatrick, Cella, Harper & Scinto, New York, NY (Pasquale A. Razzano, James M. Gibson, Of Counsel), for Defendants.

## OPINION

SWEET, District Judge.

Defendants City Holding Company ("City Holding") and City National Bank of West Virginia ("City National") have moved to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(6) or to transfer venue of this trademark infringement action to the Southern District of West Virginia. Plaintiffs Citigroup Inc. and Citicorp (collectively, "Citigroup") have opposed these motions and have moved to enjoin prosecution of a duplicative lawsuit filed in that district by one of the defendants. For the reasons that follow, the motions by City Holding and City National to dismiss or transfer will be denied, and the motion by Citigroup to enjoin prosecution of the West Virginia action will be granted.

### The Parties

Plaintiff Citigroup is a Delaware corporation with its principal office in New York, New York.

Defendant City Holding is a West Virginia corporation with its principal office in Cross Lanes, West Virginia.

Defendant City National is a wholly-owned subsidiary of City Holding and is a West Virginia corporation with its principal office in Charleston, West Virginia.

### Prior Proceedings

On September 29, 1999, Citigroup filed the instant complaint against City Holding [1], alleging claims including trademark infringement, dilution, unfair competition and false designation of origin under the Lanham Act, 15 U.S.C. §§ 1114(1), 1125(a) and (c), to which New York State and common law claims are appended. The complaint alleges that City Holding's use of the "CITY" and "CITY"-prefixed marks along with a particular logo for the provision of banking and financial services infringes Citigroup's protected trademark rights in a family of "CITI" service marks and the "Blue Wave" trade dress. Citigroup seeks an injunction against City Holding's use of the CITY mark alone and in combination with a family of CITY marks, cancellation of City Holding's federal registrations for such marks, and an award of monetary damages.[2]

On November 5, 1999, five weeks after this lawsuit was filed and before City Holding responded to it, City Holding filed a parallel lawsuit against Citigroup and Citicorp in the federal district court for the Southern District of West Virginia (the "West Virginia action"). In that suit, City Holding seeks a declaratory judgment that its family of CITY marks does not infringe Citigroup's intellectual property rights and that Citigroup's use of the "CitiFinancial" mark it recently adopted for one of its subsidiaries infringes City Holding's "City Financial Corp" mark under the Lanham Act and West Virginia law.

Ten days after filing the West Virginia action, City Holding moved before this Court to dismiss the instant complaint for lack of personal jurisdiction or, alternatively, to transfer this case to the Southern District of West Virginia pursuant to 28 U.S.C. § 1404(a).

On January 10, 2000, Citigroup moved before the District Court of West Virginia to dismiss or, alternatively, to stay or transfer the West Virginia action to this district.

On January 25, 2000, CitiGroup moved before this Court to enjoin prosecution of the later-filed, duplicative West Virginia action. City Holding cross-moved to stay proceedings in this Court pending decision on the motion to dismiss or transfer.

On April 14, 2000, the Honorable Joseph R. Goodwin of the Southern District of West Virginia denied Citigroup's motion to dismiss or, alternatively, to stay or transfer the West Virginia Action.

▓▓▓▓ This case was originally assigned to the Honorable Charles E. Haight, but was reassigned to this Court on March 28, 2000, after Judge Haight recused himself.[3]

---

1. For purposes of the discussion of the motions to transfer this action or enjoin the West Virginia action, City Holding and City National will be referred to collectively as "City Holding." For purposes of the discussion of the motion to dismiss for lack of personal jurisdiction they will be referred to as distinct entities because separate analyses are required as to their susceptibility to personal jurisdiction in New York.

2. The particular CITY-prefixed marks involved here include City National Bank, City Mortgage Services, City Mortgage Corp., City Escrow Services, City Credit Services, City Financial Center and City Financial Corp.

3. The issue of recusal surfaced again before this Court. At the parties' first appearance before me, in an abundance of caution, I disclosed on the record that: 22 years ago I was a partner at Skadden, Arps, Slate, Meagher, & Flom LLP ("Skadden Arps"), the firm which represents Citygroup in this action; in the past Skadden Arps assisted my spouse in the preparation of her will; and Skadden Arps provides legal services to the trustee of a trust to which I am a beneficiary. Shortly thereafter, City Holding requested by letter that I recuse myself.

Even where recusal is not required, which is the case with the scenario outlined above, I must still consider whether this Court's "im-

Oral argument was heard before this Court on May 3, 2000, at which time the motions decided herein were deemed fully submitted.

### Discussion

As fully discussed below, because departure from the well-settled "first-filed" rule is justified by neither special circumstances nor the balance of convenience, this decision adheres to the presumption that the first-filed parallel federal action alone should proceed. Consequently, City Holding is enjoined from further prosecuting the West Virginia action pending resolution of its motion to dismiss for lack of personal jurisdiction. In view of the conclusion that the balance of convenience does not favor City Holding's choice, the motion to transfer venue is also denied. In addition, this Court concludes that it may exercise personal jurisdiction over City Holding and City National and therefore denies the motion to dismiss under Rule 12(b)(6).

### I. The First–Filed Rule

■ It is a "well-settled principle" in this circuit that where proceedings involving the same parties and issues are pending simultaneously in different federal courts the first-filed of the two takes priority absent "special circumstances" or a balance of convenience in favor of the second.

See *First City Nat. Bank and Trust Co. v. Simmons*, 878 F.2d 76, 79 (2d Cir.1989); *see also William Gluckin & Co. v. Int'l. Playtex Corp.*, 407 F.2d 177, 178 (2d Cir. 1969). In other words, the presumption is that "the court which first has possession of the action decides it." *800–Flowers, Inc. v. Intercontinental Florist, Inc.*, 860 F.Supp. 128, 131 (S.D.N.Y.1994); *see also Simmons*, 878 F.2d at 80.

The "first-filed rule" is based on principles of judicial economy and comity. *See Simmons*, 878 F.2d at 79. In applying the rule and in furtherance of its underlying principles, the court of first-filing may enjoin the parties from proceeding in the later-filed action. *See City of New York v. Exxon Corp.*, 932 F.2d 1020, 1025–26 (2d Cir.1991); *National Equip. Rental, Ltd. v. Fowler*, 287 F.2d 43, 45 (2d Cir.1961). Staying the later-filed action serves to prevent the inefficiency and wastefulness of allowing duplicative litigation to proceed in two different fora. *See National Equip.*, 287 F.2d at 46 n. 1 (affirming decision to enjoin later-filed proceedings and noting that choice was not only proper but "a wise one indeed" in view of wastefulness of duplicative proceedings).

■ The first-filed rule is not be applied mechanically, but the party that seeks to deviate from the rule has the burden of demonstrating that circumstances justify-

partiality might reasonably be questioned." 28 U.S.C. § 455(a). The inquiry is whether "a reasonable person knowing and understanding all the relevant facts recuse the judge." *In re Drexel Burnham Lambert Inc.*, 861 F.2d 1307, 1313 (2d Cir.1988). Also, a judge "is as much obliged not to recuse himself when it is not called for as he is obliged to when it is." *Id.*

There is little question that I should not recuse myself based on my employment at Skadden Arps over two decades ago or the firm's past assistance to my spouse. *See Morgan Stanley & Co., Inc. v. Sundlun*, 88 Civ. 7966, 1988 WL 130937, at *4 (S.D.N.Y.1988) (recusal not called for where attorney-client relationship with judge or spouse has concluded); Committee on Judicial Conduct, Compendium of Selected Opinions, Committee on Codes of Conduct of the Judicial Con-

ference of the United States § 3.6–2 (1999) (same); Advisory Opinions, Committee on Codes of Conduct of the Judicial Conference of the United States, no. 24 (1999) (recusal in case involving former law firm is on case by case basis but two years is recommended);; *cf.* 28 U.S.C. § 455(b) (setting forth specific circumstances requiring recusal).

The issue of the firm's services to the trustee is more arcane. There is, of course, no connection between the pending matter and the services rendered by Skadden Arps to the trustee. Moreover, in performing those services Skadden Arps does not make determinations or take actions which concern or affect my financial interest in the trust estate. No reasonable person, knowing and understanding these facts, would conclude that recusal is called for here, and I decline to do so.

ing an exception exist. *See Hanson PLC v. Metro–Goldwyn–Mayer Inc.*, 932 F.Supp. 104, 106 (S.D.N.Y.1996); *800–Flowers*, 860 F.Supp. at 132. The determination as to whether there are circumstances warranting a departure from the first-filed rule is committed to the sound discretion of the district court. *See Simmons*, 878 F.2d at 77; *Gluckin*, 407 F.2d at 179.

■ "Special circumstances" justifying an exception have been held to be present when the first suit constitutes an "improper anticipatory filing" or was motivated solely by forum shopping. *Toy Biz, Inc. v. Centuri Corp.*, 990 F.Supp. 328, 332 (S.D.N.Y.1998); *Ontel Prod., Inc. v. Project Strategies Corp.*, 899 F.Supp. 1144, 1150 (S.D.N.Y.1995). Indeed, the Second Circuit has noted that "the chief 'special circumstance' ... is our interest in discouraging forum shopping." *Motion Picture Lab. Technicians Local 780 v. McGregor & Werner, Inc.*, 804 F.2d 16, 19 (2d Cir.1986); *see also Kellen Co., Inc. v. Calphalon Corp.*, 54 F.Supp.2d 218, 223 (S.D.N.Y.1999) ("Most commonly, courts have recognized an exception to the first-filed rule where the first-filed action was instituted by the defendant in the second action, and the defendant won the race to the courthouse under questionable circumstances.").

It is not a matter of dispute that the first-filed rule has threshold application to this case. City Holding agrees with Citigroup that the lawsuits at issue here are parallel. The overarching issue in both is whether City Holding's use of the CITY marks and trade dress infringes Citigroup's rights in the CITI family of marks and trade dress. Both parties also agree that simultaneous prosecution of both suits would advance neither the interests of efficiency for the parties nor for the courts. Thus, like Citigroup, City Holding believes that only one case should go forward, but they prefer the Southern District of West Virginia.

There is also no doubt that the present suit qualifies as the first instituted. The complaint in this case was filed more than five weeks prior to City Holding's initiation of the West Virginia action. Straightforward application of the first-filed rule would afford priority to this lawsuit.

## II. *The West Virginia Decision*

■ The question presented by the motions pending here and the motion decided by the West Virginia court is one and the same: whether making an exception to the first-filed rule is justified by special circumstances or the balance of convenience. It is unfortunate that judicial resources have now been expended twice over in consideration of this question. However, this Court necessarily reaches its own determination.[4] Nor does the decision by the District Court for West Virginia not to dismiss the West Virginia action obviate this Court's power to now

---

**4.** Indeed, it is the court in which the first-filed action was brought that should decide whether an exception to the first-filed rule applies. *See, e.g., National Equip.*, 287 F.2d at 45; *Ontel Prod.*, 899 F.Supp. at 1150 n. 9; *Donaldson, Lufkin & Jenrette, Inc. v. Los Angeles County*, 542 F.Supp. 1317, 1320 (S.D.N.Y. 1982). "Absent such a rule, there exists the possibility of inconsistent rulings on discretionary matters as well as duplication of judicial effort." *Donaldson*, 542 F.Supp. at 1320. Thus, courts in which the second-filed actions were brought have generally refrained from ruling pending a determination by the court of first-filing. *See Weber–Stephen Prods. Co. v. Ivy Mar Co., Inc.*, 93 C 5462, 1994 WL 11711, at *1 (N.D.Ill. Jan. 13, 1994) (leaving application of first-filed rule to court where first-filed case brought); *Ontel Prod.*, 899 F.Supp. at 1150 n. 9 (noting that court of second-filing had delayed action on that case pending decision by first court); *British Telecommunications v. McDonnell Douglas Corp.*, No. C–93–0677, 1993 WL 149860, at *5 (May 3, 1993) (staying second-filed action pending before it to allow court of first-filing "to proceed without fear of a conflicting order"); *Donaldson*, 542 F.Supp. at 1320 (dismissing second-filed action without prejudice because court of first-filing should determine whether exception to first-filed rule applies).

enjoin City Holding from proceeding in that action. *See National Equip. Rental, Ltd. v. Fowler*, 287 F.2d 43, 46 n. 1 (2d Cir.1961) (decision by court of first-filing to enjoin proceedings in court of second-filing despite second court's decision not to dismiss not only proper but "wise" under the circumstances). That said, the issue of whether making an exception to the first-file rule is justified is discussed below.

## III. The First–Filed Rule Will Be Followed

### A. Special Circumstances—Anticipatory Filing and Forum Shopping

City Holding contends that the instant lawsuit should yield in favor of the West Virginia action because Citigroup's institution of this action was an unabashed exercise in forum shopping. More specifically, City Holding asserts that this action constitutes an improper anticipatory filing.

An improper anticipatory filing is "one made under the apparent threat of a presumed adversary filing the mirror image of that suit" in another court. *Ontel Prod.*, 899 F.Supp. at 1150. It is improper for a party to launch a preemptive strike by racing to the courthouse in his preferred forum before his adversary has a chance to file their action in the forum of their choice, and such a party should not benefit from the first-filed rule. *See id.*, 899 F.Supp. at 1151; *Kellen*, 54 F.Supp.2d at 223 (declining to apply first-filed rule where plaintiff in first action "won the race to the courthouse under questionable circumstances"). An apparent threat of litigation can arise where there is an overt statement to that effect or where the parties have been engaged in negotiations which have broken down. *See 800-Flowers*, 860 F.Supp. at 132–33; *Hanson PLC*, 932 F.Supp. at 107.

Courts have focused in particular on situations where there is a threat of litigation followed by settlement talks, since such talks would reasonably lull the

party who would otherwise have pursued legal action into not doing so. *See Hanson PLC*, 932 F.Supp. at 107 (first-filed rule did not apply where party who filed second action had waited to file suit in reliance on proposed settlement talks); *Ontel Prod.*, 899 F.Supp. at 1150–51 ("[T]he first-filed rule should operate so as to benefit those parties who were prepared, and had every intention, to pursue foreseeable legal action but failed to bring suit first due solely to their attempt to settle the matter without court involvement.").

City Holding contends that this lawsuit is precisely the sort of anticipatory filing that obviates the first-filed rule. Their argument has its genesis in the change in early September 1999, of the name of one of Citigroup's subsidiaries from "Commercial Credit" to "CitiFinancial." This change affected over 1,200 Commercial Credit offices nationwide of which approximately 20 are located in West Virginia. City Holding avers that the adoption of the CitiFinancial name and service mark infringes its rights in the mark "City Financial Corp" used by one of its subsidiaries.

By letter of September 28, 1999, after City Holding became aware of the name change, counsel for City Holding wrote a letter to Citigroup's Chief Trademark Counsel, Anne Moses ("Moses"), contending that it had resulted in actual confusion with the City Financial Corp mark. The letter concludes:

> Please understand that [City Holding] must do everything it can to protect its valuable assets. Therefore, I request that you contact me at your earliest convenience to discuss this matter in greater detail. We would like to work with you in formulating a joint resolution to this problem that enables us to co-exist as well as protect our respective customers from continued confusion.

The following day, September 29, 1999, Citigroup filed the present lawsuit.

City Holding bases its contention that this suit is an improper anticipatory filing

on the suit's timing in relation to the September 28, 1999 letter. City Holding also points to Citigroup's failure to move previously to protect its rights as against the CITY marks which had been in use for years previous. City Holding asks this Court to conclude that plaintiffs filed this lawsuit only after they became aware of City Holding's disapproval of the name change and solely to avoid having to respond to any claim of trademark infringement over the CitiFinancial mark in a West Virginia court. This argument does not withstand scrutiny.

Despite the temporal proximity between the letter and the institution of this lawsuit, nothing in the record suggests that this case constitutes a wrongful preemptive filing. To begin with, the record does not reflect an apparent threat of litigation on the part of City Holding. The letter itself does not directly threaten litigation but instead suggests that the parties meet to discuss a solution that would enable both to coexist. Nor had the parties engaged in previous discussions to avert a rising conflict over the use of the CitiFinancial name which would have made the timing of this case suspicious.

As far as the record shows, the September 28 letter was the first indication of a potential problem with the use of the CitiFinancial name in West Virginia. In addition to the absence of an apparent threat of litigation, City Holding cannot be deemed to have been lulled into the notion that settlement talks regarding the CitiFinancial name would ensue based on its letter. There was apparently no communication between Citigroup and City Holding concerning the name change either prior to or immediately following the letter. Thus, this case is quite unlike *Hanson PLC*, 932 F.Supp. at 107, and *National Union Fire Ins. Co. of Pittsburgh v. Free-*

*port–McMoRan, Inc.*, 767 F.Supp. 568, 573 (D.Del.1991), cited by City Holding, which found the anticipatory filing exception applied where one party had clearly indicated its intent to sue, talks had begun or been promised regarding the disputed matter, and the other party then nonetheless precipitously filed suit.

Even if Citigroup might have reasonably inferred from the letter that litigation was imminent unless it ceased using the new name, one cannot reasonably conclude that this lawsuit was triggered by the letter, or even by the adoption of the CitiFinancial name. To the contrary, Moses explains in her Reply Affirmation that Citigroup had been closely monitoring City Holding's trademark filings in the United States Patent and Trademark Office ("PTO") since early 1999.[5] The investigation resulted in Citigroup's conclusion:

that we had no choice but to commence litigation to protect plaintiffs' extremely valuable and prominent trademark rights. Outside counsel (Skadden, Arps) was retained for this purpose in August 1999, and instructed to move expeditiously toward commencement of litigation.

Moses further attests that:

the process of preparing for this lawsuit, after a decision to proceed with litigation had been made, took over a month. During that time, counsel specifically and carefully investigated defendants' business activities, to satisfy ourselves that this Court had personal jurisdiction over defendants, and to confirm the nature and extent of defendants' infringing activities.

These assertions regarding Citigroup's process of investigating and preparing this lawsuit belie the conclusion that it filed this lawsuit solely in response to City

---

5. City Holding filed applications in July and October of 1997 with the PTO for registration of the following marks: City Credit Services, City Financial Corp, City Holding Company, City Mortgage Corp, City Mortgage Services, City National Bank, City Capital Resources and City Financial Center. Citicorp sought extensions of time to oppose four of these applications in February and March of 1999, but ultimately did not oppose them. Registrations for each of these marks were granted in 1999.

Holding's expressed or contemplated displeasure over the use of the CitiFinancial mark. City Holding does not offer facts or evidence to the contrary. Instead, all that City Holding offers is its speculation that this lawsuit was motivated by a desire to avoid a West Virginia forum based on the suit's timing in relation to the name change and the objection letter. It should go without saying that speculation is not sufficient to controvert the explanation attested to by Moses, which suggests nothing about the filing of this lawsuit that would implicate forum shopping.[6]

Moses' description of the genesis of this action brings us to another significant point. This lawsuit is not about a single mark, CitiFinancial, which is the only mark discussed in the September 28 letter. Instead, the claims here transcend the use of the CitiFinancial name and embrace a larger set of issues and facts, namely, City Holding's use of a group of CITY-prefixed marks for the provision of financial services and its identification of this family under the CITY umbrella. The broad scope of this action further undercuts the argument that it was an anticipatory filing triggered by the September 28 letter.

City Holding avers that, notwithstanding the expansive claims in this lawsuit, Citigroup does not really consider City Holding's use of their CITY marks to infringe upon Citigroup's intellectual property rights but instead instituted this action only to avoid a West Virginia forum for litigation over the CitiFinancial mark. In support of this contention, City Holding points to, first, Citigroup's failure to contest the registration of the CITY marks in the PTO, and second, letters written to City Mortgage Corp. in the Fall of 1999 by outside trademark counsel for Citigroup requesting consent to reserve the name "CitiMortgage, Inc." in West Virginia. In these letters, counsel for Citigroup com-

ments that "because 'City' is a commonly used prefix for financial services corporations . . . Citigroup and its many CITI companies have coexisted for many years with many 'City' entities." City Holding contends that Citigroup's failure to contest their trademark applications and the position taken by counsel in the City Mortgage letters are tantamount to an acknowledgment of the *absence* of confusion between the CITI and CITY marks, and indicate the speciousness of Citigroup's claims of infringement in this suit. According to City Holding, it necessarily follows that this action is mere camouflage devised to conceal Citigroup's true motivation for filing, i.e., forum shopping.

In her affirmation, Moses explains that Citigroup declined to contest City Holding's registrations in the PTO not because they believed that the marks weren't likely to confuse but because proceeding instead in federal court would avoid typically protracted PTO proceedings and would afford the possibility of an injunction against the use of the marks which the PTO has no power to issue. As for the "coexistence" statement contained in the City Mortgage letters, Moses states that the letters were directed at a *single* City-prefixed entity without a known connection at the time to the City Holding or its family of CITY marks. Moses explains that while it may be possible for one CITY-prefixed financial services entity to coexist with the CITI marks, Citigroup regards a *family* of CITY financial services marks to be an entirely different matter. She thus contends that the letters do not reflect a view that no confusion exists between the marks or that Citigroup does not consider City Holding's use of a *family* of CITY marks to be infringing.

Moses' explanation concerning the breadth of and basis for this action, which

6. As far as speculation goes, the letter bears the date September 28, 1999, but we are not told whether it was actually received by Citigroup on that date. Nor do we know if it would be possible for a complaint of this

magnitude, alleging seven claims and involving the use of numerous marks, to be formulated, prepared, approved and filed all within 24 hours.

again City Holding counters only with speculation, suffices to dispel the notion that Citigroup brought this action in order to avoid a West Virginia forum for litigation over the CitiFinancial mark. Whether or not plaintiffs' claims of infringement ultimately have merit is not a question presently before the Court. City Holding is free to argue at an appropriate time that there is no likelihood of confusion between the two groups of marks or that Citigroup's claims are frivolous. For now, City Holding has not demonstrated that this action is an improper anticipatory suit.

■ It is further noted that the record does not support the notion that this suit, even if not anticipatory, was nonetheless solely motivated by forum shopping and therefore should not take priority under the first-filed rule. Forum shopping giving rise to an exception to the rule may be found "where a suit bears only a slight connection to the [forum]." *Toy Biz, Inc.*, 990 F.Supp. at 332; *see also In re Arbitration Between Griffin Indus., Inc. and Petrojam, Ltd.*, 58 F.Supp.2d 212, 218 (S.D.N.Y.1999). This is not such a case.

Citigroup's headquarters are situated in Manhattan, all or most of the corporate branding decisions concerning the CITI marks took place in New York, and infringing activity arguably occurred here by virtue of City Holding's apparent use of their marks to solicit business from New York residents. Although much of the activity that Citigroup contends is infringing may have emanated from City Holding's West Virginia headquarters and involved West Virginia residents, the locus of Citigroup's headquarters and some infringing activity in New York provide this action with a sufficient nexus to New York to prevent a charge of forum shopping. *See Toy Biz*, 990 F.Supp. at 331, 332 (finding trademark infringement action had "significant connection" to New York forum where plaintiff's principal place of business was in New York and allegedly infringing products were sold throughout the country, including in New York). Nor

is there any other type of evidence that Citigroup's suit was motivated solely by forum-shopping.

### B. *Balance of Convenience*

■ Although City Holding have not shown that any special circumstances furnish an exception to the first-filed rule, departure from that principle may nonetheless be warranted if the balance of convenience militates in favor of proceeding in West Virginia. Weighing that balance in the context of a first-filed rule analysis requires consideration of the same factors that apply to the decision of whether transfer is appropriate under 28 U.S.C. § 1404(a). *See, e.g., 800–Flowers, Inc.*, 860 F.Supp. at 133; *S–Fer Int'l., Inc. v. Paladion Partners, Ltd.*, 906 F.Supp. 211, 216 (S.D.N.Y.1995). Since the factors to be evaluated are the same, their analysis will resolve both Citigroup's motion to enjoin the West Virginia action and City Holding's motion to transfer. For reasons explained below, the balance of convenience supports application of the first-filed rule and does not justify transfer of venue.

■ Transfer is appropriate where "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). It is undisputed that the present lawsuit "might have been brought" in the Southern District of West Virginia. The only question for resolution is whether the balance of convenience weighs in favor of that forum. The factors that guide this analysis include:

(1) the convenience of witnesses; (2) the location of relevant documents and the relative ease of access to sources of proof; (3) the convenience of the parties; (4) the locus of the operative facts; (5) the availability of process to compel attendance of unwilling witnesses; (6) the relative means of the parties; (7) a forum's familiarity with the governing law; (8) the weight accorded a plaintiff's

choice of forum; and (9) trial efficiency and the interests of justice, based on the totality of the circumstances.

*800–Flowers,* 860 F.Supp. at 133. City Holding bears the burden of clearly establishing that these factors favor transfer. *See, e.g., S & S Machinery Corp. v. General Motors Corp.,* No. 93 Civ. 3237, 1994 WL 529867, at *7 (S.D.N.Y. Sep. 28, 1994); *Orb Factory, Ltd. v. Design Science Toys, Ltd.,* 6 F.Supp.2d 203, 208 (S.D.N.Y.1998).

■ There is no rigid formula for balancing these factors and no single one of them is determinative. *See S & S Machinery,* 1994 WL 529867, at *7. Instead, weighing the balance "is essentially an equitable task" left to the Court's discretion. *Simmons,* 878 F.2d at 80. In performing the analysis the Court must, however, give due deference to the plaintiff's choice of forum which "should not be disturbed unless the balance of convenience and justice weigh heavily in favor of defendant's forum, especially where as here plaintiff's chosen forum is its principal place of business." *Toy Biz,* 990 F.Supp. at 330; *see also Air–Flo M.G. Co., Inc. v. Louis Berkman Co.,* 933 F.Supp. 229, 233 (W.D.N.Y. 1996).

The scales rest in equipoise as to most of the enumerated factors. Both sides allege a similar measure of inconvenience arising from the prospect of litigating in the other's choice of forum. Naturally, each side would consider it vastly more convenient and less costly to litigate this case in the district containing their corporate headquarters, where the documents necessary to prove the strength and use of their respective marks are located. It appears that the documentary proof is no more available to City Holding in West Virginia than it is to Citigroup in New York. Thus the convenience to the parties, relative expenses and access to sources of documentary proof are substantially equal so that neither is especially more burden-

some on one party as far as these factors are concerned. The same conclusion is reached with respect to the convenience to the party witnesses. Each side maintains that its contemplated employee witnesses, who have knowledge of the marks and who appear to comprise the vast majority of the potential trial witnesses on both sides, reside in or around the location of their corporate headquarters. Accordingly, this factor favors neither forum and does not weigh towards transfer.

City Holding's strongest argument for transfer is that potential non-party witnesses who may testify on the issue of actual confusion between the CitiFinancial and City Financial marks in West Virginia are not subject to compulsory process in this district. City Holding has identified two such witnesses, one of whom is a resident of West Virginia while the other is a resident of Virginia. The availability of compulsory process over material non-party witnesses is an important factor. *See Arrow Elec., Inc. v. Ducommun Inc.,* 724 F.Supp. 264, 266 (S.D.N.Y.1989). This consideration is generally relevant only with respect to third-party witnesses, since employees of the parties will as a practical matter be available in any venue by virtue of the employment relationship. *See Carruthers v. Amtrak,* No. 95 Civ. 0369, 1995 WL 378544, at *3 (S.D.N.Y. June 26, 1995).

■ It would be preferable for City Holding to have the benefit of live witness testimony on a significant issue such as actual confusion, and presumably the witnesses identified by City Holding are not subject to the reach of this Court's subpoena power.[7] However, the unavailability of process over third-party witnesses does not compel transfer when the practical alternative of offering videotaped or deposition testimony of a given witness exists. *See Dwyer v. General Motors Corp.,* 853 F.Supp. 690, 694 (S.D.N.Y.1994) (rejecting

---

7. The parties have not addressed, and the Court is not familiar with, whether the witness who resides in Virginia would be subject to compulsory process by the West Virginia court.

argument that inability to compel attendance of non-party witnesses required transfer since testimony "could be offered to the jury via deposition"); *cf. Hernandez v. Graebel Van Lines*, 761 F.Supp. 983, 989 (E.D.N.Y.1991) (rejecting argument that inability to compel attendance of non-party witnesses should prevent transfer given the alternative of providing videotaped testimony of that witness). There is no suggestion here that this testimony could not be presented in some form at trial, either by videotape or a deposition transcript.

The force of this factor is also diminished somewhat because City Holding has not shown, or even suggested, that the two third party witnesses it identified would be unwilling to testify in a New York court without the prodding of a subpoena. *See Carruthers*, 1995 WL 378544, at *2.

In addition, Citigroup has identified a third-party witness of its own who would presumably not be subject to the subpoena power of a West Virginia federal court. This individual, a former Citicorp employee who is a resident of New York, has been identified as a potential witness on the historical marketing, advertising and promotional efforts with respect to the CITI marks at issue. Citigroup has similarly neglected to indicate whether this witness would be unwilling or unable to testify in West Virginia without a subpoena—and it is certainly possible that he would be more willing than an ordinary third-party witness because he is a former employee. Nevertheless, identification of this potential witness goes toward equalizing the scales on this factor since it means that both sides have demonstrated at least the possibility that third-party witnesses might not be available to provide live testimony at a trial in the other side's preferred venue.

In any event, even if Citigroup's third party witness were disregarded, the issue of compulsory process weighs only slightly in favor of City Holding. Out of a full complement of dozens of material witnesses on many important issues, City Holding has identified just two non-party witnesses who would testify as to a single issue and has not even suggested that these witnesses would be unwilling to testify in New York.

City Holding further argues that this case should be transferred to West Virginia because that is where the events underlying the claims occurred. City Holding does not explain the basis for this conclusion in its papers, but it can be inferred that what is meant is that any confusion that exists must have occurred in West Virginia, the location of City Holding' predominant market and customer base. Consideration of all the operative facts, however, reveals that there is no dominant center of gravity for this action. To be sure, to the extent there is confusion between the marks it may have occurred primarily in West Virginia because that is the state where City Holding's business appears to be most concentrated. However, the infringement alleged by Citigroup is not limited to the borders of West Virginia. On the contrary, Citigroup alleges that City Holding has established a nationwide presence and has directed infringing solicitations at New York residents.

Moreover, actual confusion is only one aspect of the nucleus of facts in this case. To prevail on its Lanham Act claims, Citigroup must demonstrate both the validity of its marks and the likelihood of confusion caused by City Holding' use of their CITY marks. *See The Morningside Group Ltd. v. Morningside Capital Group, L.L.C.*, 182 F.3d 133, 137 (2d Cir.1999). Nor is evidence of actual confusion the only factor that goes into a likelihood of confusion analysis. *See id.* at 138. Some of the additional issues that are likely to be involved in this case include the relative strengths of the marks, the good faith adoption of certain marks by the parties and the seniority of their use. *See id.* All of Citigroup's corporate decisions concerning the branding of the CITI marks, which bear upon many of these significant issues,

occurred in New York, whereas all of City Holding's analogous decisions occurred in West Virginia. Thus, while more of the actual confusion, if any, may have occurred in West Virginia, many of the other operative facts involved in this case occurred equally in New York and West Virginia. Under these circumstances there is no single locus of operative facts.

Equally uncompelling in the transfer analysis is City Holding's contention that Citicorp's presence in West Virginia through its CitiFinancial branches located in that state tempers the inconvenience to Citigroup of litigating in that forum or makes it some how more fair to require Citigroup to litigate there. While Citicorp may do business in the State of West Virginia, its presence there is not relevant to the factors at issue on this motion. The fact that there are CitiFinancial branches in West Virginia does not change the fact that Citigroup's corporate headquarters, contemplated trial witnesses and documentary evidence are firmly ensconced in New York. Citigroup contends that none of its CitiFinancial West Virginia employees will play a role at trial and there is no indication that the mere existence of these offices will otherwise make litigating in West Virginia more convenient for Citigroup. Accordingly, the fact that Citicorp may have a greater presence in West Virginia than City Holding has in New York does not militate in favor of disturbing Citigroup's choice of forum.

At bottom, City Holding's arguments with respect to most of the enumerated factors boil down to a tradeoff of burdens. City Holding contends that venue should be transferred because West Virginia will be more convenient for it and its witnesses and closer to its sources of proof than New York. But moving this litigation south will proportionately inconvenience Citigroup. City Holding can not satisfy its burden of showing that the balance of convenience clearly favors another forum by transferring its inconvenience to plaintiffs. *See Arrow Electronics,* 724 F.Supp. at 266;

*Orb Factory,* 6 F.Supp.2d at 210. To the extent that the existence of third-party confusion witnesses who are not within this Court's subpoena power weighs in favor of a West Virginia forum, the weight due to Citigroup's choice of venue restores the balance.

Finally, in considering whether the interests of justice weigh in favor of transfer, it has not escaped this Court's notice that, instead of filing a counterclaim here, City Holding journeyed southward to file an admittedly related suit in a forum it prefers five weeks after plaintiffs instituted this action. The interests of justice do not favor transfer under these circumstances. *See Clarendon Nat'l. Ins. Co. v. Pascual,* No. 99 Civ. 10840, 2000 WL 270862, at *7 (S.D.N.Y. March 13, 2000) (interests of justice did not favor transfer to court where defendant had filed parallel action since such filing "seems tactical; if [defendant] really were concerned with judicial efficiency, he would have brought that claim as a counterclaim in this Court, rather than start a new case in [the other] court").

Having evaluated the relevant factors, while bearing in mind that the burden is on the City Holding to justify transfer, the Court concludes that the balance of convenience does not substantially favor a West Virginia forum. Accordingly, Citigroup's choice of this New York venue will not be disturbed. For the same reason, the balance of convenience does not justify departure from the first-filed rule.

### IV. *Personal Jurisdiction*

Citigroup's burden at this stage of the proceedings is to establish a *prima facie* case for jurisdiction over City Holding and City National. *See Beacon Enters., Inc. v. Menzies,* 715 F.2d 757, 768 (2d Cir.1983); *Pilates, Inc. v. Pilates Institute, Inc.,* 891 F.Supp. 175, 178 (S.D.N.Y.1995). The facts gleaned from the pleadings and affidavits are to be construed in the light most favorable to Citigroup. *See Hoffritz for Cutlery, Inc. v. Amajac, Ltd.,* 763 F.2d 55,

57 (2d Cir.1985). Ultimately, if a jurisdictional challenge is raised at trial, Citigroup will bear the burden of establishing jurisdiction over a defendant by a preponderance of the evidence. *See Hoffritz,* 763 F.2d at 57; *Levisohn, Lerner, Berger & Langsam v. Medical Taping Systems, Inc.,* 10 F.Supp.2d 334, 338–39 (S.D.N.Y. 1998).

Personal jurisdiction over a non-resident defendant in a diversity case is determined by the law of the jurisdiction in which the federal court sits. *See Bensusan Restaurant Corp. v. King,* 126 F.3d 25, 27 (2d Cir.1997). Accordingly, an assessment must be made of whether New York's Civil Practice Law and Rules ("CPLR") provides for jurisdiction. *See* N.Y. C.P.L.R. §§ 301, 302.

■ The CPLR does not extend personal jurisdiction to the full extent permitted by due process. *See Beacon,* 715 F.2d at 764 n. 6. Thus, a two-fold inquiry is required. First, it must be determined whether New York law permits the exercise of personal jurisdiction over a defendant. Second, if jurisdiction is proper under New York law, it must be determined whether exercising jurisdiction over the defendant comports with due process. *See International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945); *see also Twine v. Levy,* 746 F.Supp. 1202, 1204 (E.D.N.Y.1990).

### A. *Specific Jurisdiction*

New York's long arm statute, CPLR § 302, provides in pertinent part:

(a) As to a cause of action arising from any acts enumerated in this section, a court may exercise personal jurisdiction over any nondomiciliary ... who in person or through an agent:

 1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or

 2. commits a tortious act within the state ...; or

 3. commits a tortious act without the state causing injury to person or property within the state ...

N.Y. C.P.L.R. § 302(a).

The statute thus requires "a strong nexus between the plaintiff's cause of action and the defendant's in state conduct." *Welsh v. Servicemaster Corp.,* 930 F.Supp. 908, 910 (S.D.N.Y.1996); *see McGowan v. Smith,* 52 N.Y.2d 268, 437 N.Y.S.2d 643, 419 N.E.2d 321, 322–23 (1981) (explaining that there must be some "articulable nexus between the business transacted and the [claim]"); *see also Beacon,* 715 F.2d at 762.

### 1. *Jurisdiction Under CPLR § 302(a)(1)*

#### a. *City National*

The transacting business prong of Section 302(a) confers jurisdiction over "a defendant who purposefully avails itself of the privilege of conducting activities within New York, thus invoking the benefits and protections of its laws," where the cause of action arises out of the subject matter of the business transacted. *See, e.g., Viacom Intern., Inc. v. Melvin Simon Productions,* 774 F.Supp. 858, 862 (S.D.N.Y.1991). New York courts look to the totality of circumstances to determine whether the defendant has engaged in some purposeful activity in New York in connection with the matter in controversy. *See Longines–Wittnauer Watch Co. v. Barnes & Reinecke, Inc.,* 15 N.Y.2d 443, 261 N.Y.S.2d 8, 209 N.E.2d 68, 75 (1965).

■ A single transaction of business is sufficient to give rise to jurisdiction under CPLR § 302(a)(1), even where the defendant never enters the state, if the claim arises out of the transaction. *See Pilates,* 891 F.Supp. at 179; *Kreutter v. McFadden Oil Corp.,* 71 N.Y.2d 460, 527 N.Y.S.2d 195, 522 N.E.2d 40, 43 (1988); *see also Parke–Bernet Galleries, Inc. v. Franklyn,* 26 N.Y.2d 13, 308 N.Y.S.2d 337, 256 N.E.2d 506 (1970).

In the instant case much, although not all, of the activity engaged in by City

National which goes towards a specific jurisdiction analysis occurred via the internet. This raises the question of what type of internet activity may be deemed as supporting the exercise of personal jurisdiction over a defendant, and where such transactions should be viewed as having occurred.

It has long been observed that technological advances affecting the nature of commerce require the doctrine of personal jurisdiction to adapt and evolve along with those advances. *See Hanson v. Denckla,* 357 U.S. 235, 250–52, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958) ("As technological progress has increased the flow of commerce between States, the need for jurisdiction has undergone a similar increase.") With the advent of the internet, the courts have been confronted with a new set of challenges in this regard. The guiding principle which has emerged from the case law is that whether the exercise of personal jurisdiction is permissible is " 'directly proportionate to the nature and quality of commercial activity that an entity conducts over the internet,' " *K.C.P.L., Inc. v. Nash,* No. 98 Civ. 3773, 1998 WL 823657, at *5 (S.D.N.Y.1998) (*citing Zippo Mfg. Co. v. Zippo Dot Com,* 952 F.Supp. 1119, 1124–25 (W.D.Pa.1997)). This principle applies to an analysis under CPLR § 302(a)(1). *See K.C.P.L.,* 1998 WL 823657, at *4–*5.

More precisely, the courts have identified a spectrum of cases involving a defendant's use of the internet. At one end are cases where the defendant makes information available on what is essentially a "passive" web site. This use of the internet has been analogized to an advertisement in a nationally-available magazine or newspaper, and does not without more justify the exercise of jurisdiction over the defendant. *See K.C.P.L.,* 1998 WL 823657, at *4–*5; *Hearst Corp. v. Goldberger,* No. 96 Civ. 3620, 1997 WL 97097, at

*10 (S.D.N.Y. Feb. 26, 1997); *see also Zippo,* 952 F.Supp. at 1123. At the other end of the spectrum are cases in which the defendant clearly does business over the internet, such as where it knowingly and repeatedly transmits computer files to customers in other states. *See CompuServe, Inc. v. Patterson,* 89 F.3d 1257 (6th Cir. 1996). Finally, occupying the middle ground are cases in which the defendant maintains an interactive web site which permits the exchange of information between users in another state and the defendant, which depending on the level and nature of the exchange may be a basis for jurisdiction. *See American Homecare Fed. Inc. v. Paragon Scientific Corp.,* 27 F.Supp.2d 109, 113 (D.Conn.1998); *Zippo,* 952 F.Supp. at 1124.

City National maintains two web sites pertaining to its mortgage origination business, <*www.citylending.com* > (the "City Lending site") and <*www.citymortgageservices.com* > (the "City Mortgage site"). The City Lending site involves more than the passive posting of information about City Lending's loan products and services. Customers in New York may apply for loans on-line as well as print out an application for submission by facsimile, they may click on a "hyper link" to "chat" on-line with a City Lending representative, and they may e-mail City Lending with home loan questions and receive a response from an "online representative . . . in less than an hour."

At the very least, the interactivity of the City Lending site brings this case within the middle category of internet commercial activity.[8] Moreover, the interaction is both significant and unqualifiedly commercial in nature and thus rises to the level of transacting business required under CPLR § 302(a)(1). *See K.C.P.L.,* 1998 WL 823657, at *6; *Zippo,* 952 F.Supp. at 1124; *see also American Network, Inc. v.*

---

**8.** It is not clear that the transaction can actually be consummated on line, a scenario which bring this case out of the middle category and into the category of a business that clearly does business over the internet in New York. *See National Football League,* 2000 WL 335566, at *1.

*Access America/Connect Atlanta, Inc.,* 975 F.Supp. 494, 498–99 (S.D.N.Y.1997). The cause of action arises from this transaction of business because it is "precisely the bona fides of these products and services that [Citigroup] challenges." *Pilates,* 891 F.Supp. at 179. The Court concludes that City National's activity over the internet confers personal jurisdiction under CPLR § 302(a)(1).

Even if City National's internet activity were not enough, jurisdiction under CPLR § 302(a)(1) is further bolstered by other activities. City National has engaged in direct mail solicitation of New York business. *See Pilates,* 891 F.Supp. at 179. City National has also used New York companies to record mortgages on behalf of City Mortgage Services to perfect the liens on real property located in New York which secure the loan contracts. Thus, there is no question that Citigroup has met its burden to show a basis for jurisdiction under this provision of the CPLR.

### b. *City Holding*

■ Under CPLR § 302(a)(1), a defendant who has contracted anywhere to supply goods or services within New York is subject to personal jurisdiction here. A licensor/owner of intellectual property rights which are exploited by licensees within this state may be subject to personal jurisdiction under this provision in a trademark infringement suit involving the licensed property. *See Firma Melodiya v. ZYX Music GMBH,* No. 94 Civ. 6798, 1995 WL 28493, at *3 (S.D.N.Y. Jan. 25, 1995); *Pony Int'l, Inc. v. Genfoot Am., Inc.,* No. 82 Civ. 6517, 1983 WL 691, at *2–*3 (S.D.N.Y. July 27, 1983). CPLR § 302(a)(1) is satisfied where the licensee of intellectual property uses the licensed material in commerce in New York pursuant to the license agreement, since the licensor is thereby deemed to have contracted to supply services in the state. *See, e.g., Lipton v. Nature Co.,* 781 F.Supp. 1032, 1035 (S.D.N.Y.1992); *Greenky v. Irving Music,* Inc., No. 80 Civ. 2776, 1981 WL 1370, at *1–*2 (S.D.N.Y. July 13, 1981).

This principle applies even where the license agreement did not specifically contemplate use of the intellectual property in New York, so long as such use was foreseeable. *See Firma Melodiya,* 1995 WL 28493, at *3.

■ City Holding contends that even if City National is subject to personal jurisdiction in New York, City Holding is not. In support of this contention, City Holding points out that it is a West Virginia corporation that is not registered to do business in New York, that it has no real estate, officers, directors, employees, or bank accounts here, and that it has not earned any income here.

City Holding's attempt to distance itself from the use of the CITY marks in this state is unavailing. City Holding is the owner and licensor of the CITY marks, of which all but the CITY HOLDING COMPANY mark itself are used by City Holding's wholly-owned subsidiaries. At least one of these subsidiaries, City National, has used CITY marks within New York to solicit and engage in business activity with New York residents with respect to mortgage loans and services. City Holding is also the named plaintiff in the West Virginia action, in which it seeks a declaratory judgment pertaining to the entire family of CITY marks. The September 28 letter concerning the City Financial mark was sent on behalf of City Holding, not City Financial. Thus, City Holding cannot separate itself from the use of the CITY marks by its subsidiaries, or say that such use was unforeseeable, and there is jurisdiction under CPLR § 302(a)(1).

### 2. *Jurisdiction Under CPLR § 302(a)(2)*

■ There is an alternative basis for personal jurisdiction over City National pursuant to CPLR § 302(a)(2), which confers jurisdiction over a defendant who commits a tortious act within the state where the cause of action arises from that act. This is an action arising out of and challenging alleged trademark infringe-

ment and dilution activity. Trademark infringement occurs where the attempted passing off of an infringing mark occurs. *See Pilates*, 891 F.Supp. at 180; *Exovir, Inc. v. Mandel, M.D.*, No. 94 Civ. 3546, 1995 WL 413256, at *3 (S.D.N.Y. July 12, 1995). Moreover, there is no minimum threshold of activity required so long as the cause of action arises out of the allegedly infringing activity in New York. "Offering one copy of an infringing work for sale in New York ... constitutes commission of a tortious act within the state sufficient to imbue [the] Court with personal jurisdiction over the infringers." *Editorial Musical Latino Americana, S.A. v. Mar Int'l Records, Inc.*, 829 F.Supp. 62, 64 (S.D.N.Y.1993); *see also Dave Guardala Mouthpieces, Inc. v. Sugal Mouthpieces, Inc.*, 779 F.Supp. 335, 337–38 (S.D.N.Y. 1991).

■ City National sent direct mailings to New York residents directed at soliciting their business and displaying the allegedly infringing marks. The attempt to pass off these marks, which is allegedly tortious conduct, occurred within New York because that is where the marks were received and viewed by the direct mailing recipients. This activity provides a basis for exercising personal jurisdiction over City National for purposes of a suit challenging the use of those very marks. *See Pilates*, 891 F.Supp. at 180.

■ The import of the City National web sites displaying allegedly infringing mark is more complicated. The mere existence of these web sites does not confer jurisdiction under CPLR § 302(a)(2). Although it is in the very nature of the internet that the allegedly infringing marks contained in these web sites can be viewed anywhere, this does not mean that the infringement occurred everywhere. Instead, courts have held that in the case of web sites displaying infringing marks the tort is deemed to be committed where the web site is created and/or maintained. *See National Football League*, 2000 WL 335566, at *2; *American Network*, 975

F.Supp. at 497; *see also Hearst*, 1997 WL 97097, at *10. This rule may seem incongruous when juxtaposed with the rule applicable to ordinary infringing goods, which is that "the wrong takes place not where the deceptive labels are affixed to the goods or where the goods are wrapped in the misleading packages, but where the passing off occurs." *German Educational Television Network, Ltd. v. Oregon Public Broadcasting Co.*, 569 F.Supp. 1529, 1532 (S.D.N.Y.1983). A rationale for the difference may be that literal application of the "where viewed" rule would result in jurisdiction anywhere in the world in every infringement case involving a web site.

There is no evidence that the City Lending and City Mortgage web sites were created in New York or are maintained on New York servers. Thus, the mere display of the CITY marks on these web sites cannot be deemed a tort committed within this State.

■ However, as with the analysis under CPLR § 302(a)(1), the significance of the web sites shifts to the extent that there is interaction between City National and New York residents. It was noted above that the City Lending site offers the possibility of an on-line "chat" with City National representatives. To the extent that such chats involve the transmission of messages that contain allegedly infringing marks to New York residents, City National should be deemed to have attempted to pass off the mark within New York rather than outside it. *See Zippo*, 952 F.Supp. at 1127 (defendant who transmitted messages bearing infringing mark to residents of another state committed trademark infringement in recipient state). This type of internet activity further supports jurisdiction under CPLR § 302(a)(2).

### 3. *Jurisdiction Under CPLR § 302(a)(3)*

#### a. *City National*

■ Finally, there is yet a third basis for exercising specific jurisdiction, i.e., pur-

suant to CPLR § 302(a)(3). This provision confers jurisdiction over a defendant where the cause of action arises out of a tort committed outside of New York but the tort causes harm within New York, the defendant expected or should reasonably have expected the act to have consequences in the state, and the defendant derives substantial revenue from interstate or international commerce. *See* CPLR § 302(a)(3).

As explained above, the mere creation and maintenance of web sites bearing infringing marks does not constitute a tort in any state where the sites can be viewed. Thus, to the extent that the web sites at issue are simply capable of being viewed in New York, without more, any tortious activity must be deemed to have occurred outside of New York.[9] The question then becomes whether the other requirements of CPLR § 302(a)(3) are satisfied.

▪ Injury within the state includes harm to a business in the New York market in the form of lost sales or customers. *See American Network, Inc. v. Access America/Connect Atlanta,* 975 F.Supp. 494, 497 (S.D.N.Y.1997) (citations omitted). This rule is satisfied by Citigroup's claim that its actual and potential customers in New York are confused or deceived when they view and interact with the City National web sites. *See id.; National Football League,* 2000 WL 335566, at *2.

Furthermore, it was reasonably foreseeable that publication of web sites with the offending marks would have consequences in New York. *See American Network,* 975 F.Supp. at 497; *National Football League,* 2000 WL 335566, at *2. Finally, there is little doubt that City National derives substantial revenue from interstate commerce. Commerce involving banking institutions constitutes interstate commerce, especially where as here the institution is insured by the Federal Deposit Insurance Corporation. *See, e.g., United States v. Trammell,*

133 F.3d 1343, 1353 (10th Cir.1998); *Securities & Exch. Comm'n v. S & P Nat'l Corp.,* 265 F.Supp. 993, 995 (S.D.N.Y. 1966), modified on other grounds, 360 F.2d 741 (2d Cir.1966). Moreover, City Mortgage solicits home, equity, and mortgage loans on behalf of City National throughout the United States, and City Mortgage has over 80,000 accounts nationwide and services nearly $2 billion in loans. Also City National has branches and or employees located in West Virginia, Ohio, and California. In conclusion, jurisdiction over City National pursuant to CPLR § 302(a)(3) is proper.

### b. *City Holding*

▪ As the licensor of the CITY marks, City Holding is also subject to jurisdiction under CPLR § 302(a)(3). Entering into a licensing agreement outside of New York for an infringing mark constitutes a tort committed outside of New York. The alleged injury occurred within the State, however, due to use of the mark by City Holding's licensee, City Mortgage, in direct mailings and via the internet. *See Firma Melodiya,* 882 F.Supp. at 1311–12; *Pony Int'l,* 1983 WL 691, at *1.

There is little doubt that it was foreseeable to City Holding that use of CITY marks by its wholly-owned subsidiary would have consequences in New York. City Holding's Annual Report states that "City Holding and its affiliates have become leaders in the mortgage obligation business in West Virginia and throughout the country." In addition, City Holding and City National have several officers and directors in common. City Holding cannot disclaim knowledge of City National's use of CITY marks within New York. Finally, City Holding and its subsidiaries derive significant income from interstate commerce. Therefore, personal jurisdiction over City Holding under CPLR § 302(a)(3) is proper.

---

**9.** This conclusion only applies to City National's internet activity. Its direct mailing activities are subject to a different analysis, as explained earlier.

### 4. Due Process

The exercise of personal jurisdiction under a state long-arm statute comports with constitutional due process only if the defendant has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe*, 326 U.S. at 316, 66 S.Ct. 154 (citation and internal quotation marks omitted); *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); *Chew v. Dietrich*, 143 F.3d 24, 28 (2d Cir. 1998). The Court has considered the factors relevant to this inquiry and finds that the assertion of personal jurisdiction over the individual defendants would not offend the standards of due process. *See Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 567–69 (2d Cir.1996).

### B. General Jurisdiction Under CPLR § 301

Although it is unnecessary to determine whether there is general jurisdiction over City National and City Holding because the Court has found that there is specific jurisdiction, a brief discussion of this issue is warranted.

CPLR § 301 states that a New York court "may exercise jurisdiction over persons, property, or status as might have been exercised heretofore." The statute incorporates all grounds of jurisdiction previously recognized at common law. *See Penny v. United Fruit Co.*, 869 F.Supp. 122, 125 (E.D.N.Y.1994). Pursuant to CPLR § 301, a foreign corporation will be subject to personal jurisdiction in New York if it is present or "doing business" in the state. A corporation's activity rises to the level of "doing business" only when it is engaged in "such a continuous and systematic course of activity that it can be deemed present in the state of New York." *Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44, 50–51 (2d Cir.1991) (*quoting Laufer v. Ostrow*, 55 N.Y.2d 305, 449 N.Y.S.2d 456, 434 N.E.2d 692, 694 (1982)

(citations omitted)); *see Mareno v. Rowe*, 910 F.2d 1043, 1046 (2d Cir.1990); *Frummer v. Hilton Hotels Int'l, Inc.*, 19 N.Y.2d 533, 281 N.Y.S.2d 41, 227 N.E.2d 851, 853 (1967).

A foreign corporation may be subjected to the jurisdiction of New York even without any physical presence here if the corporation conducts, or purposefully directs, business " 'not occasionally or casually, but with a fair measure of permanence and continuity.'" *Landoil Resources Corp. v. Alexander & Alexander Servs.*, 77 N.Y.2d 28, 563 N.Y.S.2d 739, 565 N.E.2d 488, 490 (1990) (*quoting Tauza v. Susquehanna Coal Co.*, 220 N.Y. 259, 267, 115 N.E. 915, 917 (N.Y.1917)). The test, a "simple pragmatic one," *Bryant v. Finnish Nat. Airline*, 15 N.Y.2d 426, 260 N.Y.S.2d 625, 208 N.E.2d 439, 441 (1965), is necessarily fact sensitive. *See Landoil Resources Corp. v. Alexander & Alexander Servs.*, 918 F.2d 1039, 1043 (2d Cir.1990); *Stark Carpet Corp. v. M–Geough Robinson, Inc.*, 481 F.Supp. 499, 504 (S.D.N.Y.1980).

"In assessing jurisdiction under this pragmatic standard, New York courts have generally focused on the following indicia of jurisdiction: the existence of an office in New York; the solicitation of business in New York; the presence of bank accounts or other property in New York; and the presence of employees or agents in New York." *Landoil*, 918 F.2d at 1043; *see Hoffritz*, 763 F.2d at 58. However, "[s]olicitation of business alone will not justify a finding of corporate presence in New York with respect to a foreign manufacturer or purveyor of services." *Laufer*, 449 N.Y.S.2d at 459, 434 N.E.2d 692; *see Frummer*, 281 N.Y.S.2d 41, 227 N.E.2d at 853. Yet, under the "solicitation plus" test, if the solicitation "is substantial and continuous, and defendant engages in other activities of substance in the state, then personal jurisdiction may properly be found to exist." *Landoil*, 918 F.2d at 1043–44; *see Beacon*, 715 F.2d at 763; *Aquascutum of London, Inc. v. S.S. Amer-*

*ican Champion,* 426 F.2d 205, 211 (2d Cir.1970).

Citigroup avers that this Court has general jurisdiction over City National and City Holding under the "solicitation plus" test. As explained below, Citigroup has demonstrated substantial and continuous solicitation activity by City National of business in New York. The Court declines to resolve whether Citigroup has demonstrated sufficient "plus" factors but observes that it is unlikely that the Court would conclude Citigroup has done so.

### 1. *Solicitation Activity*

As described above, City National conducts a nationwide mortgage origination business through its City Mortgage and City Lending Divisions. City National solicits business for its lending products and services in New York through advertising circulars mailed directly to New York residents and through its web sites. The direct mail circulars display the allegedly infringing CITY marks and promote the lending products and services offered by City National. They also include a toll-free number, the location of the City Lending web site, and the statement that City National is a "Licensed Mortgage Banker, NYS Banking Department". The City Lending web site provides comprehensive information about City Lending's loan products and services, allows customers in New York to apply for loans on-line or print out an application for submission by facsimile, and offers the opportunity to "chat" online with a City National representative. Prospective customers may also e-mail City Lending with home loan questions and are promised a response from an "online representative . . . in less than an hour." The City Mortgage site advertises City National's loan servicing products and invites prospective customers to call or e-mail regarding those products.

### 2. *Plus Factors*

Solicitation must be accompanied by other "activities of substance" in order for there to be general jurisdiction over the defendant. *Landoil,* 918 F.2d at 1043–44. The first difficulty with Citigroup's argument in this regard is that much of it is speculative. Thus, Citigroup offers the predictions of an experienced real estate attorney as to ways in which City National's lending business would likely require it to conduct activities other than solicitation within New York, such as conducting title searches, commencing foreclosure proceedings, and taking title to property in New York as a result of any foreclosures. These predictions, however, are not in themselves evidence that such activities actually occur.

There is evidence that the loans issued by City National are secured by mortgages on New York property which are recorded in New York. This activity involves the use of New York companies to record the liens on behalf of City Mortgage. The cases cited by Citigroup as support for the proposition that this activity rises to the level of sufficient "plus" factors, however, involved more substantial activity. *See Stursburg & Veith v. Eckler Indus., Inc.,* No. 95 Civ. 5147, 1995 WL 728480, at *4 (S.D.N.Y. Dec. 8, 1995); *Bicicletas Windsor S.A. v. Bicycle Corp. of Am.,* 783 F.Supp. 781, 784–85 (S.D.N.Y.1992); *Laufer,* 55 N.Y.2d at 310–12, 449 N.Y.S.2d 456, 434 N.E.2d 692. Nor does it appear that City National exercises the requisite degree of control for there to be jurisdiction over City National by virtue of its relationship to these New York companies. *See Landoil,* 918 F.2d at 1046; *Ball v. Metallurgie Hoboken–Overpelt, S.A.,* No. 87 Civ. 191, 1989 WL 87418, at *9–*10 (N.D.N.Y. July 31, 1989).

Finally, as discussed above, City National's contact with New York residents via the internet does go beyond solicitation and provides a basis for exercising specific jurisdiction. Whether it satisfies the requirements for general jurisdiction, however, is another question. This is a particularly underdeveloped area of the law. Most courts considering the significance of internet activity for the exercise of person-

al jurisdiction have done so in the context of a specific, rather than general, jurisdictional analysis. In this case, the Court is not convinced that the activities herein satisfy the "solicitation plus" test for general jurisdiction. Nor do the cases cited by Citigroup assist much in this regard, as one concerns specific jurisdiction, *see Zippo*, 952 F.Supp. 1119, while the other concerns a general jurisdiction statute that, unlike § CPLR 301, reaches to the full extent of the constitutional due process test, *see Mieczkowski v. Masco Corp.*, 997 F.Supp. 782, 784 (E.D.Tex.1998).

On the facts of this case, the Court would be hesitant to conclude that CPLR § 301 is satisfied. Moreover, given the finding of specific jurisdiction, it is unnecessary to resolve this question or to venture into the essentially uncharted waters of the significance of the defendant's internet activity for a general jurisdiction analysis, and the Court declines to do so.

### V. *Appeal From The Decision To Enjoin The West Virginia Action*

 The rule in this circuit is that an order granting or denying a motion to enjoin prosecution of an action in another forum is an interlocutory order over which the court of appeals has jurisdiction. *See* 28 U.S.C. § 1292(a)(1); *Computer Assocs. Internat'l Inc. v. Altai, Inc.*, 893 F.2d 26, 28 (2d Cir.1990); *National Equip.*, 287 F.2d at 45. Furthermore, although ordinarily there is no appeal from a decision granting or denying a transfer pursuant to Rule 1404(a), such a decision is reviewable where it is "from the grant of an interlocutory injunction". *National Equip.*, 287 F.2d at 45; *see also Codex Corp. v. Milgo Elec. Corp.*, 553 F.2d 735 (1st Cir.1977) ("[T]he court of appeals will review the entire venue question as ancillary to the appeal from the disposition of the request for an injunction against a suit in another district.")

### *Conclusion*

For the reasons explained above, City Holding's and City National's motions to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(6) or to transfer venue under 28 U.S.C. § 1404(a) are denied, and Citygroup's motion to enjoin City Holding from further prosecution of the lawsuit in the Southern District of West Virginia is granted.

It is so ordered.