**RADIOACTIVE, J.V., Plaintiff,**

v.

**Shirley MANSON, Defendant.**

**No. 01 Civ.1948(SAS).**

United States District Court, S.D. New York.

July 29, 2001.

Steve A. Marenberg, Charles E. Elder, Irell & Manella LLP, Los Angeles, California, Andrew H. Bart, David S. Levine, Pryor, Cashman, Sherman & Flynn LLP, New York, New York, for Plaintiff.

Marc Marmaro, Elizabeth Barrowman Gibson, Christina Harvell Brown, Jeffer, Mangels, Butler & Marmaro LLP, Los Angeles, California, Robert Jossen, Louis Solomon, Swidler Berlin Shereff Fried-

man, LLP, New York, New York, for Defendant.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

On March 7, 2001, Radioactive Records, J.V. ("Radioactive") filed this diversity action against Shirley Manson, a well-known singer and performer, alleging, *inter alia,* a claim for breach of contract. Manson now moves to dismiss this action in favor of parallel state court proceedings in California, arguing that the California Action was filed first and that this Court should abstain from exercising jurisdiction. Radioactive cross-moves for partial summary judgment on two issues: (1) that New York law governs the recording contract between Manson and Radioactive; and (2) because New York law governs, California Labor Code § 2855 ("section 2855") is inapplicable to that recording contract. For the reasons set forth below, both motions are granted.

## I. BACKGROUND

### A. The Relevant Contracts

On February 23, 1993, Manson, a resident of Scotland, signed a recording contract with Radioactive, a joint venture between Radioactive, Inc. and MCA Records (now Universal Music Group ("UMG")) (the "Manson–Radioactive Agreement"). *See* Plaintiff's Statement Pursuant to Local Rule 56.1 ("Pl.56.1") ¶¶ 1, 2, 10; 4/27/01 Declaration of Shirley Manson in Support of Motion to Dismiss ("Manson Decl. I") ¶ 2. That contract obligates Manson to de-

liver at least one album and, at the sole option of Radioactive, up to six additional albums. *See* Complaint ¶ 7. The contract also designates New York as the forum of choice and New York law as the rule of decision in any future dispute over the contract. *See* Pl. 56.1 ¶ 3; 2/23/93 Manson–Radioactive Agreement, Ex. G to 4/25/01 Declaration of Elizabeth Barrowman Gibson, Manson's counsel ("Gibson Decl."), at 40.[1] Later that year, Radioactive released an album titled "Angelfish" featuring Manson as the lead singer. *See* Pl. 56.1. ¶ 12; Manson Decl. I ¶ 2. Angelfish was unsuccessful; only 10,000 copies were sold. *See* Manson Decl. I ¶ 2.

In late 1994, Butch Vig, Steve Marker, and Doug (Duke) Erikson formed the band Garbage in Madison, Wisconsin and signed a recording contract with Almo Records ("Almo"). *See* 12/21/94 Agreement between Almo and Garbage ("Almo–Garbage Agreement"), Ex. A to 5/21/01 Declaration of William A. Berrol, counsel for defendant, in Opposition to Plaintiff's Motion for Partial Summary Judgment ("Berrol Decl. II"). As veteran music producers, Vig, Marker, and Erickson wanted to ensure that their endeavor would be directed by Jerry Moss, a legendary figure in the music industry. *See* First Amended Complaint ("FAC") in *Garbage, Inc. v. Almo Sounds, Inc.*, No. BC244047 (Cal. Supp. filed Jan. 29, 2001) (*"Garbage v. Almo"*), Ex. A to Gibson Decl., ¶ 2. To that end, Garbage negotiated the inclusion of a "Key Man" clause in its agreement. *See* Almo–Garbage Agreement at 78. Garbage would only be bound to Almo Records as long as Jerry Moss was Chairman. *See id.*

---

**1.** The Manson–Radioactive Agreement provides:

This agreement has been entered into in the State of New York. The validity, interpretation and legal effect of this agreement is governed by the laws of New York applicable to contracts entered into and performed

entirely within such State. The New York courts (state and federal), only, will have jurisdiction over any controversies regarding this agreement, and the parties hereto consent to the jurisdiction of said courts. Manson–Radioactive Agreement at 40.

The contract also designates California as the forum of choice and California law as the rule of decision. *See id.* at 62.

Having seen Manson in an Angelfish video on MTV, Garbage invited Manson to record with them as the band's lead singer. *See* 5/18/01 Declaration of Shirley Manson in Opposition to Motion for Partial Summary Judgment ("Manson Decl. II") ¶ 11; *see also* Manson Decl. I ¶ 4. On August 10, 1994, Manson entered into a written agreement with Garbage—an agreement which was negotiated and entered into in California ("Manson–Garbage Agreement"). *See* Manson's Response to Plaintiff's Statement Pursuant to Local Rule 56.1 ("Def.56.1") ¶ 23; Manson Decl. I ¶ 10. On December 21, 1994, Manson and Radioactive executed an Inducement Letter as a material part of the Garbage–Almo Agreement ("Manson Inducement Letter"). *See* Def. 56.1 ¶ 24; Manson Decl. I ¶ 9. The Manson Inducement Letter contains a California choice of forum and a California choice of law provision. *See* Def. 56.1 ¶ 14; Manson Inducement Letter, Ex. 5 to 5/23/01 Declaration of Marc Marmaro, Manson's counsel, in Opposition to Plaintiff's Motion for Partial Summary Judgment ("Marmaro Decl."), at 149.

Shortly thereafter, Radioactive was asked to allow Manson to record one song with Garbage. *See* Complaint ¶ 9. Radioactive granted such permission and subsequently agreed to let Manson record an entire album with Garbage. *See* Pl. 56.1 ¶ 13; Complaint ¶ 10. The album, eponymously named "Garbage," was very successful, selling over 4 million copies worldwide and garnering three Grammy nominations. *See* Complaint ¶ 11; FAC in *Garbage v. Almo* ¶ 1. By agreement dated September 1, 1997, Radioactive agreed to allow Manson to record a second album with Garbage in return for a portion of the royalties. *See* Pl. 56.1 ¶ 14;

Def. 56.1 ¶ 25; *see also* 9/1/97 Agreement between Almo and Radioactive ("Almo–Radioactive Agreement"), Ex. 6 to Marmaro Decl.; FAC in *Garbage v. Almo* ¶ 1. The Almo–Radioactive Agreement also contained California choice of forum and choice of law clauses. *See* Def. 56.1 ¶ 25; Almo–Radioactive Agreement at 166. Garbage's second album, titled "Garbage Version 2.0," was also successful, selling another 4 million copies. *See* FAC in *Garbage v. Almo* ¶ 1. By Garbage's estimation, Radioactive garnered more than $1,000,000 in royalties from the album's sales. *See* Def. 56.1 ¶ 55.

In 2000, Moss sold his publishing company, which included Almo, among other affiliates, to UMG, the successor to MCA Records. *See* Berrol Decl. ¶ 10; *see also* Irv Lichtman, "Moss, Alpert Sell Rondor to Universal, Settle Lawsuit," *Billboard*, August 12, 2000, Ex. C. to Berrol Decl. II, at 395. Thereafter, invoking the Key Man clause, Garbage sought on October 25, 2000 to terminate its contract with Almo on the assumption, supported by press coverage, that Jerry Moss was no longer the Chairman of Almo. *See* Barrol Decl. ¶ 11; FAC in *Garbage v. Almo* ¶ 2. According to Garbage, the band met with representatives of UMG, who informed them that even if they could terminate their contract, UMG would still control Manson's original contract with Radioactive. *See* Berrol Decl. ¶ 12; FAC in *Garbage v. Almo* ¶ 2.

**B. The California Action**

On January 29, 2001, Manson and Garbage filed suit in California state court essentially seeking to become "free agents" (the "California Action"). *See* Pl. 56.1 ¶ 15. Their complaint seeks a declaratory judgment that both the Almo–Garbage Agreement and the Almo–Radioactive Agreement are unenforceable and/or

have terminated. *See* Complaint in *Garbage v. Almo* ¶¶ 25–28. On February 5, 2001, the plaintiffs in the California Action filed the FAC, adding a claim that the Manson–Radioactive Agreement, executed in February 1993, become unenforceable after February 23, 2000 pursuant to California Labor Code § 2855 ("section 2855"), which provides that personal service contracts "may not be enforced ... beyond seven years from the commencement of service under" the contract.[2] *See* FAC in *Garbage v. Almo* ¶ 26.

On March 8, 2001, one day after filing the instant complaint, Radioactive moved to dismiss the declaratory judgment claim in the California Action asserting that any claim regarding the Manson–Radioactive Agreement must be brought in New York. *See* Gibson Decl. ¶ 5. Then, on March 15, 2001, Radioactive filed a Cross–Complaint against Manson in the California Action. *See id.* at 3; *see also* Conditional Cross–Complaint of Radioactive J.V., Ex. E to Gibson Decl. The Cross–Complaint asserted the same claims and factual allegations brought in the instant action. *See* Gibson Decl. ¶ 6.

Radioactive's motion to dismiss was denied on April 10. The California court noted that both of the relevant contracts—the Almo–Garbage Agreement and the Manson–Radioactive Agreement—were inextricably intertwined, that dismissal would lead to piecemeal litigation, and that it expected the New York federal court to respect its decision. *See* 4/10/01 Minute Order of the Honorable Marvin M. Lager ("California Order"), Ex. C to Gibson Declaration; 4/10/01 Transcript of Proceedings before the Honorable Marvin M. Lager ("California Tr."), Ex. D to Gibson Decl.,

at 4–6, 10, 22, 25. On June 25, the California Court of Appeal denied Radioactive's petition for writ of mandate seeking review of the California court's order. *See Radioactive Records, J.V. v. Shirley Manson,* No. B149619 (Cal.App. 4th June 25, 2001), Ex. A to 6/26/01 Letter from Elizabeth Barrowman Gibson.

### C. The Instant Action

Radioactive filed this action more than five weeks after the California Action was filed. In this action, Radioactive asserts three claims. In Claim I, plaintiff contends that Manson breached the Manson–Radioactive Agreement by repudiating her obligations in the recording contract and refusing to deliver the required additional six albums. *See* Complaint ¶¶ 18–23. In Claim II, plaintiff maintains that in the event that section 2855 is deemed to render the Manson–Radioactive Agreement unenforceable, Radioactive should still be awarded damages pursuant to California Labor Code § 2855(b)(3) for Manson's failure to deliver the remaining six albums. *See id.* ¶¶ 25–27. Finally, in Claim III, plaintiff seeks a declaration that the California Action violates the choice of law and choice of forum clauses in the Manson–Radioactive Agreement, and that the Manson–Radioactive Agreement is enforceable. *See id.* ¶¶ 29–31.

## II. PLAINTIFF'S SUMMARY JUDGMENT MOTION

### A. Legal Standard for Motion for Summary Judgment

A party is entitled to summary judgment when there is "no genuine issue of material fact" and the undisputed facts

---

**2.** Section 2855 states, in pertinent part:
 [A] contract to render personal service, other than a contract of apprenticeship as provided in Chapter 4 (commencing with

Section 3070), may not be enforced against the employee beyond seven years from the commencement of service under it.
Cal. Lab.Code § 2855 (West 2000).

warrant judgment for the moving party as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 321–22, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "While genuineness runs to whether disputed factual issues can 'reasonably be resolved in favor of either party,' materiality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." *Mitchell v. Washingtonville Cent. Sch. Dist.,* 190 F.3d 1 (2d Cir. 1999) (quoting *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996)).

The moving party "always bears" the burden of production or "the initial responsibility of informing the ... court of the basis for its motion, and identifying those portions of 'the pleadings, the depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact ." *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(c)); *see also LaFond v. General Physics Servs. Corp.,* 50 F.3d 165, 171 (2d Cir.1995). Once that burden is satisfied, the non-moving party must present "significant probative supporting evidence" that a factual dispute exists. Fed.R.Civ.P. 56(e); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The court's role is not to try issues of fact, but rather to determine whether issues exist to be tried. *See Rule v. Brine,* *Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996). All ambiguities must be resolved in favor of the party against whom summary judgment is sought. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505; *Rule,* 85 F.3d at 1011. If there is any evidence in the record from which a reasonable inference could be drawn in favor of the non-moving party on a material issue of fact, summary judgment is improper. *See Hetchkop v. Woodlawn at Grassmere, Inc.,* 116 F.3d 28, 33 (2d Cir.1997).

## B. Choice of Law

 "Federal courts sitting in diversity in New York must apply New York's choice-of-law rules when determining the law that governs the contract." *Lehman Bros. Commercial Corp. v. Minmetals Int'l Non–Ferrous Metals Trading Co.,* No. 94 Civ. 8301, 2000 WL 1702039, at*11 (S.D.N.Y. Nov. 13, 2000); *see also Lund's Inc. v. Chemical Bank,* 870 F.2d 840, 845 (2d Cir.1989). New York courts follow the test laid out in the Restatement (Second) of Conflicts of Laws § 187.[3] Accordingly, a court may refuse enforcement of a choice-of-law clause only where (1) there is no reasonable basis for the parties' choice, or (2) the application of the chosen law would violate a fundamental public policy of another jurisdiction with materially greater interests in the dispute. *See Lehman Bros. Commercial Corp.,* 2000 WL 1702039, at *12; *see also Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.,* 230 F.3d 549, 556 (2d

---

**3.** Restatement (Second) of Conflicts of Laws § 187(2) provides:

The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either

(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

Cir.2000) ("New York law is clear in cases involving a contract with an express choice-of-law provision: Absent fraud or violation of public policy, a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction."); *International Minerals and Res., S.A. v. Pappas*, 96 F.3d 586, 592 (2d Cir.1996) (same).

■ Manson, however, argues that the enactment of New York General Obligation Law § 5–1401 ("section 5–1401") in 1984 created an exception to this general rule with respect to personal service contracts. *See* Manson's Memorandum of Points and Authorities in Opposition to Plaintiff Radioactive Records, J.V.'s Motion for Partial Summary Judgment ("Def.Sum.Jud.Opp.") at 6–10. Section 5–1401 provides that for certain commercial contracts of at least $250,000, but explicitly excluding contracts for personal services, the parties' selection of New York law in the contract is enforceable even if the transaction itself bears no reasonable relation to New York.[4] According to Manson, section 5–1401 carved out an exception for personal service contracts—such contracts are governed by the law of the state with the most significant contacts to the contract and parties (the "center of gravity" test) even where there is a contractual choice of law provision. *See id.*

■ Manson appears to have badly misread section 5–1401. By enacting that

statute, "New York sought to secure and augment its reputation as a center of international commerce." *See Lehman Bros. Commercial Corp.*, 2000 WL 1702039, at *12. The exclusion of personal service contracts from that law's purview merely establishes that the older reasonable basis standard still applies to choice of law clauses in those contracts. *See, e.g.,* *Woodling v. Garrett Corp.*, 813 F.2d 543, 551 (2d Cir.1987) (applying reasonable basis standard to choice of law provision in employment contract); *Aramony v. United Way of Am.*, No. 96 Civ. 3962, 1998 WL 205331, at *2 (S.D.N.Y. Apr. 27, 1998) (same); *Don King Prods. v. Douglas*, 742 F.Supp. 741, 756 (S.D.N.Y.1990) (applying reasonable basis standard to choice of law provision in promotional contract). Indeed, the New York legislature made clear in section 5–1401(2) that "[n]othing contained in [section 5–1401] shall be construed to limit or deny the enforcement of any provision respecting choice of law in any other contract, agreement or undertaking." N.Y. Gen. Oblig. Law § 5–1401(2).

■ The Manson–Radioactive Agreement expressly designates New York law as the rule of decision in any dispute over the contract. Thus, Radioactive need merely show that New York has a "substantial relationship to the parties or the transaction," or that there was a "reasonable basis for the parties' choice." Re-

---

4. Section 5–1401 provides:
 1. The parties to any contract, agreement or undertaking, contingent or otherwise, in consideration of, or relating to any obligation arising out of a transaction covering in the aggregate not less than two hundred fifty thousand dollars ... may agree that the law of this state shall govern their rights and duties in whole or in part, whether or not such contract, agreement or undertaking bears any reasonable relation to this state. This section shall not apply to any

contract, agreement or undertaking (a) for labor or personal service, [or] (b) relating to any transaction for personal, family or household services ...
 2. Nothing contained in this section shall be construed to limit or deny the enforcement of any provision respecting choice of law in any other contract, agreement or undertaking.
 N.Y. Gen. Oblig. Law § 5–1401 (McKinney 1989).

statement (Second) of Conflicts of Laws § 187. Manson's contention that California has the most substantial contacts with the contract and parties, therefore, is simply irrelevant to the choice-of-law inquiry.[5]

■ Each party has provided reams of materials to dispute the "facts" asserted by the other. Radioactive asserts that its principal place of business is New York; Manson asserts that it is California. Radioactive asserts that its President Gary Kurfirst is based in New York; Manson asserts that he is based in Los Angeles. Luckily, these disputed facts are immaterial to the choice of law inquiry. Even if one accepts Manson's version of the facts, Radioactive and Manson had a reasonable basis for choosing New York law. Manson is a resident of Scotland, and New York may have seemed the most convenient forum for both parties. At least some of Manson's negotiations with Radioactive took place in New York. *See* Manson Decl. II at 3. UMG regularly put New York choice of law provisions in recording contracts. *See* Plaintiff's Memorandum of Points and Authorities in Support of Radioactive Records, J.V.'s Motion for Partial Summary Judgment at 4 ("New York federal and state courts have significant experience with music industry contracts, and the parties wanted to avail themselves of that experience by selecting a New York forum and New York law."). Manson's first album, "Angelfish", was recorded in the New York metropolitan area under the supervision of New York-based employees of Radioactive. *See* Manson Decl. II at 2–3. The album was mastered in New York and delivered to Radioactive in New York. *See id.* at 2. At the time the contract was executed, a time before any relationship with Garbage was envisioned, New York had sufficient contacts with the Manson–Radioactive transaction and New York law was a perfectly reasonable choice for the parties.

■ Manson argues, however, that section 2855 reflects a powerful California interest in controlling California employers, thus requiring that the New York choice of law clause be ignored. *See* Def. Sum. Jud. Opp. at 1–2. This argument is unavailing. In the primary California decision concerning the scope of section 2855, *De Haviland v. Warner Bros. Pictures, Inc.*, 67 Cal.App.2d 225, 235–36, 153 P.2d 983 (1944), the court found that the California legislature enacted section 2855 in an effort to protect California employees.[6]

**5.** Manson recites a litany of contacts with California: (1) Radioactive exercised the option in Manson's contract in California; (2) the Almo–Radioactive Agreement and the *Manson Inducement Letter* had California choice of forum and law clauses and were executed in California; (3) the Manson–Garbage Agreement was negotiated and executed in California; (4) all of Garbage's negotiations took place in Los Angeles, California; (5) Garbage's attorney, William Berrol, is located in Los Angeles; (6) Radioactive's representatives and counsel are located in Los Angeles; (7) Manson's representatives were directed to negotiate with Radioactive in Los Angeles; (8) Manson attended business meetings with the band in Los Angeles; (9) Manson's professional services as lead singer of Garbage have all been performed in either California or Wisconsin; (10) marketing, promotions, and videos for Garbage have all been performed in California; (11) witnesses and documents germane to this dispute are located in California; and finally, (12) Radioactive had represented in an earlier dispute involving Garbage and its foreign distributors that Radioactive is a California-based Joint Venture. *See* Def. Sum. Jud. Opp. at 1, 10–18; Defendant's Memorandum of Points and Authorities in Support of the Motion to Dismiss or, in the Alternative, to Stay this Action ("Def.Mem.") at 7–8.

**6.** The court did not discuss whether section 2855 would cover out-of-state employees. The court held that the legislature enacted section 2855 pursuant to its powers under the California Constitution "to provide for the

Manson does not contend that she is a California employee. *See* Def. Sum. Jud. Opp. at 20 ("regardless of whether Ms. Manson is or is not a California resident...."). Only one New York case has addressed section 2855's applicability to non-California employees. *See Ketcham v. Hall Syndicate, Inc.*, 37 Misc.2d 693, 236 N.Y.S.2d 206 (Sup.Ct.N.Y.Co.1962), *aff'd*, 19 A.D.2d 611, 242 N.Y.S.2d 182 (1st Dept. 1963). That court held that section 2855 does not trump a New York conflict of laws determination that New York law should apply. *See id.* at 211–12; *see also Foxx v. Williams*, 244 Cal.App.2d 223, 242, 52 Cal.Rptr. 896 (1966) (noting that the court in *Ketcham* held that "section 2855 did not apply, both because plaintiff was not an employee, and because the law of New York, not California, governed"). No court, in any state including California, has reached a contrary result. Moreover, as Radioactive points out, a determination that section 2855 applies to non-California employees of California employers would be problematic. Foreign employees of

California businesses would suddenly receive the benefits of California's "7–year rule," a result the California legislature could not have intended.[7]

Much like the "dog that did not bark," the overwhelming silence concerning section 2855 is the strongest clue. *See* Arthur Conan Doyle, "Silver Blaze," in *The Complete Sherlock Holmes* 347, 349 (Doubleday 1922) (1892). Section 2855 was enacted in 1937. Application of the law to non-California employees of California employers would have wide-reaching consequences. The fact that only one court has addressed its applicability to non-California employees—and held that it does not apply—militates against a finding that the California legislature intended to cover non-California employees.

Accordingly, plaintiff's motion for partial summary judgment is granted. New York law governs the Manson–Radioactive Agreement. Because New York law applies, section 2855 is not applicable to the Manson–Radioactive Agreement.[8]

comfort, health, safety and general welfare of any or all employees." *De Haviland*, 67 Cal. App.2d at 236, 153 P.2d 983.

7. Manson also argues that this Court should look to California Business and Professions Code § 16600 ("section 16600") and cases that have held it applicable to non-California employees of California employers. This argument is without merit. Section 16600 provides that "[e]xcept as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." Cal. Bus. & Prof.Code § 16600 (West 2000). The cases cited by Manson applying section 16600 deal primarily with non-compete clauses. *See Advanced Bionics Corp. v. Medtronic Inc.*, 87 Cal. App.4th 1235, 105 Cal.Rptr.2d 265 (2001); *Application Group, Inc. v. Hunter Group, Inc.*, 61 Cal.App.4th 881, 72 Cal.Rptr.2d 73 (1998). There is no non-compete clause in dispute. Radioactive does not seek to enjoin Manson from contracting with another rec-

ord label after her contract with Radioactive is terminated. Rather, Radioactive seeks to enforce its current contract. Moreover, the cases cited by Manson applying section 16600 to non-California employees bear considerably more connection to California than the case at bar. *See Advanced Bionics Corp.*, 87 Cal.App.4th at 1249, 105 Cal.Rptr.2d 265 (applying section 16600 where a California employer seeks to invalidate a non-compete clause in an out-of-state contract of a potential California employee); *Application Group, Inc.*, 61 Cal.App.4th at 901, 72 Cal.Rptr.2d 73 (same). Further, insofar as the decisions in those cases reflect an important California interest in California employers, it is an interest in protecting those employers, not limiting them. *See Advanced Bionics Corp.*, 87 Cal.App.4th at 1249, 105 Cal.Rptr.2d 265; *Application Group, Inc.*, 61 Cal.App.4th at 901, 72 Cal.Rptr.2d 73.

8. To borrow a phrase used by the California court, this Court expects the California court

## III. DEFENDANT'S MOTION TO DIS-MISS

### A. First to File

 Manson asserts that Radioactive's New York action should be dismissed pursuant to the first-to-file doctrine because the California Action was filed first. *See* Def. Mem. at 13–18. Manson misapplies the doctrine. The first-to-file doctrine applies to concurrent federal litigation—not concurrent state/federal litigation. "It is a 'well-settled principle' in this circuit that where proceedings involving the same parties and issues are pending simultaneously in different federal courts the first-filed of the two takes priority absent 'special circumstances' or a balance of convenience in favor of the second." *Citigroup Inc. v. City Holding Co.,* 97 F.Supp.2d 549, 555 (S.D.N.Y.2000) (citation omitted); *cf. Meeropol v. Nizer,* 505 F.2d 232, 235 (2d Cir.1974) ("Where an action is brought in one federal district court and a later action embracing the same issue is brought in another federal court, the first court has jurisdiction to enjoin the prosecution of the second action."). All of the cases cited by Manson involve two (or more) federal district courts. *See, e.g., First City Nat'l Bank and Trust Co. v. Simmons,* 878 F.2d 76, 77 (2d Cir.1989); *William Gluckin & Co. v. International Playtex Corp.,* 407 F.2d 177, 178 (2d Cir. 1969); *Citigroup Inc.,* 97 F.Supp.2d at 555; *800–Flowers, Inc. v. Intercontinental Florist, Inc.,* 860 F.Supp. 128, 131 (S.D.N.Y. 1994).[9]

The Supreme Court has delineated a standard by which federal courts can determine whether to defer to parallel state actions. That standard is set forth in *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). "[O]rder in which the actions were filed" is one prong in a six-prong test for abstention. *FDIC v. Four Star Holding Co.,* 178 F.3d 97, 101 (2d Cir.1999). If Manson's argument were correct, and "first-to-file" could by itself necessitate dismissal from federal court in favor of parallel state proceedings, the inclusion of order of filing as one factor in a careful abstention balancing test would be meaningless. Accordingly, Manson's motion to dismiss this action under the first-to-file doctrine is denied.

### B. Abstention

 Manson also seeks to have this action stayed or dismissed under the *Colorado River* abstention doctrine. *See* Def. Mem. at 20–25, 20 n. 3. The Second Circuit recently summarized that doctrine as follows:

> Abstention is an extraordinary and narrow exception to a federal court's duty to exercise its jurisdiction. The Supreme Court has recognized that courts should abstain from the exercise of jurisdiction only in the exceptional circumstances where the order to the parties to repair to state court would clearly serve a countervailing interest. The test for determining whether abstention is appropriate, first articulated in *Colorado*

to respect this decision. *See* California Tr. at 12; *supra* Part I.B.

**9.** Manson's confusion is understandable. Most of the cases she cites refer to the doctrine generally, taking it for granted that the doctrine applies only to concurrent federal litigation. *See, e.g., First City Nat'l Bank and Trust Co.,* 878 F.2d at 79 ("where there are

two competing lawsuits, the first should have priority"). Moreover, the doctrine does apply in cases where the first filed suit was originally filed in state court but subsequently removed to federal court after the parallel federal suit had been filed but prior to the motion to dismiss. *See 800–Flowers, Inc.,* 860 F.Supp. at 131.

*River,* now requires examination of six factors: (1) assumption of jurisdiction over a res; (2) inconvenience of the forum; (3) avoidance of piecemeal litigation; (4) order in which the actions were filed; (5) the law that provides the rule of decision; and (6) protection of the federal plaintiff's rights. The test does not rest on a mechanical checklist, but on a careful balancing of the important factors as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction.

*FDIC,* 178 F.3d at 101 (quotation marks and citations omitted). The underlying principles of the *Colorado River* doctrine rest on considerations of "wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation." *Colorado River,* 424 U.S. at 817, 96 S.Ct. 1236 (quotation marks and citation omitted). These principles, however, must be balanced with the "virtually unflagging obligation of the federal courts to exercise the jurisdiction given them." *Id.* In order to prevail on their motion, the moving parties must shoulder a heavy burden, *see King v. Hahn,* 885 F.Supp. 95, 97 (S.D.N.Y.1995), because "[o]nly the clearest of justifications will warrant [a] dismissal." *Colorado River,* 424 U.S. at 819, 96 S.Ct. 1236.

### 1. The Assumption of Jurisdiction by Either Court over Any Res or Property

There is no res involved in this dispute. This factor is thus irrelevant to the abstention inquiry. *See Arkwright–Boston Mfrs. Mut. Ins. Co. v. City of New York,* 762 F.2d 205, 210 (2d Cir.1985); *see also Ackoff–Ortega v. Windswept Pac. Entm't Co.,* 98 F.Supp.2d 530, 536 (S.D.N.Y.2000).

### 2. Desirability of Avoiding Piecemeal Litigation

The Supreme Court has stated that "the most important factor in our decision to approve the dismissal [in *Colorado River*] was the 'clear federal policy ... [of] avoidance of piecemeal adjudication.'" *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 16, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983) (quoting *Colorado River,* 424 U.S. at 819, 96 S.Ct. 1236); *see also Arkwright–Boston Mfrs.,* 762 F.2d at 211 ("[T]he danger of piecemeal litigation is the paramount consideration...."); *American Alliance Ins. Co. v. Eagle Ins. Co.,* 961 F.Supp. 652, 656 (S.D.N.Y.1997) (same). However, the "mere potential for conflict in the results of the adjudications, does not, without more, warrant staying [the] exercise of federal jurisdiction." *Colorado River,* 424 U.S. at 815, 96 S.Ct. 1236; *see also GBA Contracting Corp. v. Fidelity and Deposit Co. of Md.,* No. 00 Civ. 1333, 2001 WL 11060, at *2 (S.D.N.Y. Jan. 4, 2001).

Radioactive has filed a Cross–Complaint in the California Action that is identical to the Complaint in this action. *See* Gibson Decl. at 3; *see also* Conditional Cross–Complaint of Radioactive J.V., Ex. E to Gibson Decl. Although not a determinative factor, the existence of duplicative litigation weighs in favor of abstention. *See Telesco v. Telesco Fuel and Masons' Materials, Inc.,* 765 F.2d 356, 362 (2d Cir. 1985) (affirming abstention in part because "the federal and state actions are essentially the same"); *see also Arkwright–Boston,* 762 F.2d at 211 ("Maintaining virtually identical suits in two forums ... would waste judicial resources and invite duplicative effort."); *Tarka v. Greenfield Stein & Senior, LLP,* No. 00 Civ. 1262, 2000 WL 1121557, at *5 (S.D.N.Y. Aug. 8, 2000) (same); *Inn Chu Trading Co. v. Sara Lee Corp.,* 810 F.Supp. 501, 508 (S.D.N.Y.1992) (abstaining where the issue in the federal case was "at the core of the state action" and recognizing that the overriding con-

cerns expressed in the abstention cases are "the avoidance of piecemeal or purely duplicative litigation and the concomitant waste of judicial resources").

The California court has already refused to dismiss the action between Manson and Radioactive, finding that UMG controlled all the contracts in question and that dismissal would lead to piecemeal litigation. *See* California Order; California Tr. at 4–6, 10, 22, 25. That court also determined that piecemeal litigation in New York and California would make settlement of the case far more difficult. *See* California Order; California Tr. at 25.

Radioactive implicitly argues that Manson and Garbage are distinct. *See* Plaintiff's Memorandum of Points and Authorities in Opposition to Shirley Manson's Motion to Stay or Dismiss This Action ("Pl.Opp.") at 15, 16 n. 11. Neither has an interest in the litigation of the other, and there is no need for all of the claims to be adjudicated together. *See id.* Garbage can record without Manson, and Manson can record without Garbage. This is disingenuous. Manson is the public image of Garbage. Notably, Radioactive's President himself wrote that "Garbage has become Shirley Manson." 4/15/97 Radioactive Memo from Gary Kurfirst, Ex. 17 to Marmaro Decl., at 345. To the record-buying world Garbage and Manson are one and the same, and all of the contracts in dispute necessarily concern all of Garbage's members, Manson included.

Both the New York federal action and the California Action concern the eventual relationship between Garbage and UMG. A number of the contracts concerning Garbage's relationship with UMG—the Almo–Garbage Agreement, the Manson Inducement Letter, and the Almo–Radioactive Agreement—contain California forum selection clauses, making it impossible to fully litigate Garbage's status in New York. Separate litigation of the different contracts increases the likelihood that this dispute will drag on and decreases the likelihood of settlement. This factor weighs heavily in favor of abstention.

### 3. Order in Which the Actions Were Filed

■ The California Action was filed on January 29, 2001. The New York federal action was filed on March 7, 2001. However, "priority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made on the two actions." *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 21, 103 S.Ct. 927. Radioactive argues that the federal action has progressed further because Radioactive has already provided discovery in compliance with Federal Rule of Civil Procedure 26(a) and because it has already made a non-jurisdictional motion, namely the motion for partial summary judgment addressed above. *See* Pl. Opp. at 14–15. This argument is somewhat misleading. Discovery in the California Action has proceeded more slowly, at least in part, because of Radioactive's unilateral refusal to comply with Manson and Garbage's discovery requests. *See* Defendant Shirley Manson's Reply Memorandum of Points and Authorities in Support of Her Motion to Dismiss or, in the Alternative, to Stay this Action ("Def. Rep. Mem .") at 6; Plaintiffs' Reply to Radioactive Records, J.V.'s Separate Statement of Items in Dispute Regarding Plaintiffs' Motion to Compel Responses to First Set of Requests for Admission ("Motion to Compel"), Ex. A to 5/30/01 Declaration of Christina Harvell Brown, counsel for defendant, in Support of Defendant Shirley Manson's Reply Memorandum ¶ 2. Radioactive also asserts that depositions taken by Garbage in California should not be considered because Garbage is not a proper party to Radioac-

tive's dispute with Manson. *See* Def. Rep. Mem.; Motion to Compel.

Arguably, both actions have progressed at an even pace. Nonetheless, because the burden is on the moving party to demonstrate exceptional circumstances, this factor weighs against abstention. *See McConnell v. Costigan*, No. 00 Civ. 4598, 2000 WL 1716273, at *7 (S.D.N.Y. Nov. 16, 2000) ("Because neither case is significantly advanced, the factor weighs against abstention.").

### 4. Inconvenience of the Federal Forum

■ Manson argues that it is inconvenient to litigate the case on both coasts, especially as Garbage is currently in Wisconsin recording its third album. *See* Def. Mem. at 16. Radioactive asserts that the convenience of the federal forum is demonstrated by the express New York forum selection clause in the Manson–Radioactive Agreement. *See* Pl. Opp. at 15.

The Manson–Radioactive Agreement is in dispute in both the federal and state actions. There will undoubtedly be considerable overlap in discovery. Witnesses and parties will be forced to travel back and forth between California and New York. Furthermore, discovery and testimony concerning the Manson–Radioactive Agreement is likely to cover many of the same issues, documents, and witnesses as will be involved in Garbage's larger dispute with UMG. Because all parties, including Radioactive, Manson and Garbage, are already litigating the issues underlying this dispute in California, the New York forum is clearly inconvenient for all involved. This factor weighs in favor of abstention.

### 5. Which Law Provides the Rule of Decision

■ All the claims here are state law claims. "[T]he absence of any signifi-

cant federal interests in this action provides additional grounds for abstention." *Cadle Co. v. Bankers Fed. Sav. FSB*, 929 F.Supp. 636, 639 (E.D.N.Y.1996); *see also Loral Fairchild Corp. v. Matsushita Elec. Indus. Co.*, 840 F.Supp. 211, 217 (E.D.N.Y.1994) ("When state law will apply to the bulk of the claims this factor will weigh in favor of a federal court abstaining ."). However, as discussed above, New York rather than California law governs disputes concerning the Manson–Radioactive Agreement. This does not necessarily make abstention inappropriate. "Simply because this court sits in New York does not mean that it can apply New York state law any better than the California court. Federal courts are obliged to give comity to state courts and not to assume expertise where none may lie." *Loral Fairchild Corp.*, 840 F.Supp. at 217 (citing *Carnegie–Mellon University v. Cohill*, 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988)). This factor therefore weighs slightly in favor of abstaining.

### 6. Can the State Court Adequately Protect Plaintiff's Rights?

■ All of Radioactive's claims against Manson in this action have also been asserted in Radioactive's Cross–Complaint in the California Action. There is no reason to believe that the California court cannot protect Radioactive's rights. *See Wiggin & Co. v. Ampton Invs., Inc.*, 66 F.Supp.2d 549, 553 (S.D.N.Y.1999) ("Wiggin's rights are adequately protected in the California Action, where it can assert (as counterclaims) the same claims raised here."). This factor weighs in favor of abstention.

### 7. Balancing the Factors

■ In the current action the first factor is irrelevant, the second, fourth, fifth and sixth factors weigh in favor of abstention and only the third factor weighs slightly against it. The Second Circuit has

held the "[n]o single factor is necessarily decisive, and the weight to be given to any one factor may vary greatly from case to case, depending on the particular setting of the case." *Village of Westfield v. Welch's,* 170 F.3d 116, 121 (2d Cir.1999) (quotation marks and citations omitted). However, in balancing the factors, there is a strong presumption against surrendering jurisdiction. *See Colorado River,* 424 U.S. at 813, 96 S.Ct. 1236.

"The Court ruled, in *Colorado River,* that a district court may abstain from exercising its authority when a state forum has concurrent jurisdiction, and when wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation, counsels such abstention." *Arkwright–Boston,* 762 F.2d at 211 (quotation marks, citation, and alteration omitted). The essential question involved in both this dispute and the California Action is the future relationship of Garbage and UMG. This Court's exercise of jurisdiction will lead to duplicative efforts, piecemeal litigation, and the possibility of inconsistent determinations. Worse, the multiple actions in different courts decrease the chances of both settlement and efficient resolution of the underlying dispute between Garbage and UMG. Allowing this action to proceed will only waste judicial resources. Accordingly, defendant's motion to dismiss this action pursuant to the *Colorado River* abstention doctrine is granted.

## IV. CONCLUSION

For the reasons set forth above, both plaintiff's motion for partial summary judgment and defendant's motion to dismiss are granted. The Clerk of the Court is directed to close this case.