**RAYTHEON COMPANY, Plaintiff,**

v.

**NATIONAL UNION FIRE INSUR-ANCE COMPANY OF PITTS-BURGH, PA., Defendant.**

**No. 03 Civ. 9230(SAS).**

United States District Court, S.D. New York.

Jan. 7, 2004.

Peter N. Wang, Friedman, Wang & Bleiberg, PC, New York, NY, Edmund M. Kneisel, Kilpatrick Stockton LLP, Atlanta, GA, for Plaintiff.

Michael S. Davis, Anthony I. Giacobbe, Jr., Zeichner Ellman & Krause, New York, NY, for Defendant.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

Raytheon Company ("Raytheon") brings this action against National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union") seeking a stay of arbitration[1] and a declaration under the Fed-

---

**1.** Raytheon seeks the stay pursuant to section 7503(b) of New York's Civil Practice Law and Rules ("C.P.L.R."), which states, in relevant part:

eral Arbitration Act ("FAA")[2] that the dispute between the parties is not subject to arbitration.[3] National Union cross moves under section 4 of the FAA to compel arbitration of the underlying dispute.[4] National Union also seeks to enjoin Raytheon from the prosecution of parallel litigation in Massachusetts.[5] Raytheon, in turn, asks this Court to "defer ruling on National Union's motion" pending disposition of Raytheon's motion to stay arbitration now pending in the Massachusetts action or, in the alternative, either (1) stay arbitration pending disposition of the entire Massachusetts action or (2) deny National Union's motion to compel arbitration because National Union has waived its right to demand arbitration.[6]

## I. BACKGROUND

### A. The Parties

Raytheon is a Delaware corporation with its principal place of business in Massachusetts. National Union is a Pennsylvania corporation with its principal place of business in New York.[7]

### B. The Insurance Policies

National Union provided an insurance program (the "Program") to Raytheon from April 1, 1994 through June 1, 2002.[8] A Payment Agreement between Raytheon and National Union was added to the Program on June 1, 1998.[9] The Payment Agreement states that it is part of a "Program" that "comprises a uniquely negotiated set of agreements" between Raytheon and National Union.[10] Under the Payment Agreement, Raytheon consented to "pay [National Union] all [of Raytheon's] Payment Obligation[11] and to per-

---

Subject to the provisions of subdivision (c), a party who has not participated in the arbitration and who has not made or been served with an application to compel arbitration, may apply to stay arbitration on the ground that a valid agreement was not made or has not been complied with ...

N.Y. C.P.L.R. § 7503(b) (McKinney's 2003).

**2.** 9 U.S.C. § 1 *et seq.*

**3.** *See* 11/20/03 Complaint filed in the Southern District of New York ("New York Compl.").

**4.** Section 4 states, in relevant part:
A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under Title 28, in a civil action ... arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement. Five days' notice in writing of such application shall be served upon the party in default.... The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the

parties to proceed to arbitration in accordance with the terms of the agreement....
9 U.S.C. § 4.

**5.** *See* 12/15/03 Notice of Motion for an Order Compelling Arbitration; *see also* Memorandum of Law in Support of National Union's Motion to Compel Arbitration and to Enjoin Prosecution of the Massachusetts Action ("Def.Mem.") at 1–2.

**6.** Memorandum of Law in Opposition to National Union's Motion to Compel Arbitration and to Enjoin Prosecution of the Massachusetts Action ("Pl.Mem.") at 7–8.

**7.** New York Compl. ¶¶ 2–3.

**8.** *Id.* ¶ 6.

**9.** *See* 6/1/98 Payment Agreement for a Risk Management Program ("Payment Agreement"), Ex. A to Raytheon's Motion for Preliminary Injunction filed in the District Court of Massachusetts, Ex. 1 to 12/15/03 Declaration of Michael S. Davis, National Union's counsel ("Davis Decl.").

**10.** Payment Agreement at 3.

**11.** "Payment Obligation" is defined as Raytheon's "obligation to pay [National Union]

form all [its] obligations according to this Agreement and Schedule [12] for all entities covered by the Policies." [13] "Policies" is defined as "any or all of the insurance policies described by their policy numbers in the Schedule, and their endorsements, modifications, replacements and renewals." [14] One of the policies listed on the Schedule is National Union Policy Number RMGL 319–7097 (the "Master Policy"), which is discussed in greater detail below.[15]

Notably, the Payment Agreement provides that unresolved disputes "must be settled by Arbitration." [16] The dispute resolution provision states:

> If a dispute that you [Raytheon] and we [National Union] cannot settle by mutual agreement *arises about this agreement or any transaction related to it*, that dispute must be submitted to 3 arbitrators. We may submit to such arbitration any dispute not resolved within 30 days after it arises.
>
> You must notify us in writing as soon as you have submitted a dispute to arbitration. We must notify you in writing as

soon as we have submitted a dispute to arbitration.

> This Section will apply whether that dispute arises before or after termination of this Agreement. . . .

> The arbitration must take place in New York, New York unless you and we agree otherwise. The arbitration must be governed by the United States Arbitration Act, Title 9 U.S.C. Section 1, et seq. Judgment upon the award rendered by the arbitrators may be entered by a court having jurisdiction thereof.[17]

Additionally, the Payment Agreement provides that "[t]he arbitrators ... will have exclusive jurisdiction over the entire matter in dispute, *including any question as to its arbitrability.*" [18]

## C. The Dispute

Pursuant to a stock purchase agreement of 2000, Raytheon sold various engineering and construction subsidiaries to Morrison Knudsen Corporation, now known as Washington Group International, Inc.[19] These former Raytheon subsidiaries were covered under insurance policies issued by National Union.[20] The primary policy un-

---

for the insurance and services in accordance with the terms of the Program." *Id.* at 4.

**12.** "Schedule" refers to "each of the attachments" to the Payment Agreement "that describes specific elements of the Agreement for a specified period of time. Each Schedule is part of this Agreement." *Id.*

**13.** *Id.* at 3.

**14.** *Id.* at 4.

**15.** *See* Payment Agreement Schedule of Policies and Payments Effective from June 1, 1998 ("Schedule") at 2.

**16.** *Id.* at 10.

**17.** *Id.* at 10 (emphasis added).

**18.** *Id.* at 11 (emphasis added).

**19.** *See* New York Compl. ¶ 8.

**20.** *See id.* ¶¶ 6–8. The transaction as described in the New York Complaint is more

complicated than described above. According to the Complaint, pursuant to the stock purchase agreement:

> Raytheon and Raytheon Engineers & Constructors International, Inc. ("RECI"), as Sellers, sold various engineering and construction direct and indirect subsidiaries of RECI, including Raytheon Engineers & Constructors, Inc. ("RE & C") to Morrison Knudsen Corporation, a Delaware corporation, n/k/a Washington Group International Inc. ("WGII"), as Buyer. The stock of the first tier subsidiaries owned directly by RECI was transferred by agreement with WGII to an operating subsidiary of WGII known as Morrison Knudsen Corporation, an Ohio corporation, n/k/a Washington Group International, Inc. ("WGI"). Thereafter, certain companies sold to WGII were merged into or became affiliates of WGI.

*Id.* ¶ 8. I will refer to the Washington Group International, Inc. companies described above as "WGI Companies."

der which these former Raytheon subsidiaries were covered is the Master Policy, which was executed in April 1994.[21] The Master Policy provided commercial general liability ("CGL") coverage, among other coverages, insuring the former Raytheon subsidiaries, as well as Raytheon itself, in the amount of $5 million.[22] The Master Policy also provided that "'in the event' National Union paid any damages under the Policy, [Raytheon and its subsidiaries] would reimburse the full amount of such payment up to the $5 million per occurrence retained amount for CGL Claims."[23]

On May 14, 2001, the WGI Companies filed a petition for bankruptcy in Nevada.[24] Until that date Raytheon and its former subsidiaries defended the insurance claims, managed the defense of those claims, assessed the risk of exposure to liability and damages, and negotiated and paid all settlements of significant insurance claims.[25] After the WGI Companies filed for bankruptcy, both Raytheon and the WGI Companies stopped paying the insurance claims.[26]

Raytheon alleges that during and after the bankruptcy proceedings, National Union "claimed that Raytheon was the guarantor of the obligations of the WGI Companies under the self-insured retention[27] endorsements of the National Union policies."[28] Raytheon further contends that to the extent that "National Union unilaterally has paid or settled claims after WGI emerged from bankruptcy, National Union did so voluntarily and without Raytheon's necessary consent, in violation of applicable Massachusetts law."[29]

## II. PROCEDURAL HISTORY

On October 31, 2003, National Union served a demand for arbitration, pursuant to the arbitration clause in the Payment Agreement.[30] Under the Payment Agreement, Raytheon was required to select the first arbitrator within thirty days following receipt of the Demand for Arbitration.[31] In the Demand for Arbitration, National Union invoked sections 7502(a)(i)[32] and

21. 11/18/03 Complaint filed in the District of Massachusetts ("Massachusetts Compl.") ¶ 7, Ex. D to New York Compl. At the same time it issued the Master Policy, National Union issued an "umbrella liability policy ... providing $20 million in coverage for [Raytheon and its former subsidiaries]." *Id.* ¶ 11.

22. *Id.* ¶ 7.

23. *Id.* ¶ 8.

24. *See* New York Compl. ¶ 9.

25. *See id.*

26. *See id.*

27. "No coverage was provided under the National Union policies until the amount of a CGL claim exceeded the $5 million retention, which was treated as a 'self-insured retention' throughout the coverage period." *Id.* ¶ 7.

28. Pl. Mem. at 1.

29. *Id.* at 1–2.

30. *See* Demand for Arbitration, Ex. A to Raytheon's Motion for Preliminary Injunction filed in the District of Massachusetts, Ex. 1 to Davis Decl. ("Demand for Arbitration").

31. *See* Payment Agreement at 10 ("You must choose one arbitrator and we must choose another. They will choose the third. If you or we refuse or neglect to appoint an arbitrator within 30 days after written notice from the other party requesting it to do so, or if the two arbitrators fail to agree on a third arbitrator within 30 days of their appointment, either party may make an application to a Justice of the Supreme Court of the State of New York, County of New York and the Court will appoint the additional arbitrator or arbitrators.").

32. Section 7502(a)(i) states:

(a) A special proceeding shall be used to bring before a court the first application arising out of an arbitrable controversy which is not made by motion in a pending action. (i) The proceeding shall be brought in the court and county specified in the agreement. If the name of the county is not specified, proceedings to stay or bar

7503(c) [33] of New York's C.P.L.R., providing that unless Raytheon applied to stay the arbitration in a court in New York within twenty days after service of the Demand for Arbitration, Raytheon would be precluded from objecting on the grounds that there was no valid agreement to arbitrate this dispute.[34] Raytheon did not appoint an arbitrator.

Instead, on November 18, 2003, Raytheon filed a complaint in the United States District Court for the District of Massachusetts "asserting substantially the same issues and disputes as those asserted by National Union in the Demand [for Arbitration]." [35] Two days later, in compliance with the requirement of New York law, Raytheon then filed a complaint in the Southern District of New York seeking to stay the arbitration. On December 8, 2003, Raytheon moved in the Massachusetts district court to enjoin National Union from pursuing the Demand for Arbitration. On consent, National Union's time to respond to this motion was extended to January 6, 2004.[36] Then, on December 15, 2003, National Union asked this Court to compel arbitration and to enjoin the Massachusetts action. The motion was fully briefed and heard on December 30, 2003.[37]

## III. DISCUSSION

### A. The First–Filed Rule

 As a principle of sound judicial administration, the "first filed" rule states that "where an action is brought in one federal district court and a later action embracing the same issue is brought in another federal court, the first court has jurisdiction to enjoin the prosecution of the second action, [absent] special circumstances which justify giving priority to the second action." [38] Special circumstances are present, for example: (1) where the first suit was filed as a result of forum shopping; (2) when the first suit constitutes an improper anticipatory filing; or when a party is prepared to pursue a lawsuit, but first attempts a settlement and her adversary takes advantage of the situation by filing suit. Additionally, where the two actions were filed within a short span of time, the court may afford a diminished degree of deference to the forum of the first filing.[39] Even if none of the exceptions to the first-filed rule apply,

---

arbitration shall be brought in the county where the party seeking arbitration resides or is doing business, and other proceedings affecting arbitration are to be brought in the county where at least one of the parties resides or is doing business or where the arbitration was held or is pending.

N.Y. C.P.L.R. § 7502(a)(i) (McKinney's 2003).

**33.** Section 7503(c) states, in relevant part:
A party may serve upon another party a demand for arbitration ... and stating that unless the party served applies to stay the arbitration within twenty days after such service he shall thereafter be precluded from objecting that a valid agreement was not made or has not been complied with and from asserting in court the bar of a limitation of time.

N.Y. C.P.L.R. § 7503(c) (McKinney's 2003).

**34.** *See* Demand for Arbitration at 5.

**35.** *See* Def. Mem. at 7; *see also* Massachusetts Compl.

**36.** *See* Raytheon's Motion for Preliminary Injunction filed in the District of Massachusetts. While it is possible that reply papers will be filed, I will assume for purposes of deciding this motion that the Massachusetts motion will be fully submitted on January 6, 2004.

**37.** *See* Transcript of December 30, 2003 Oral Argument ("Tr.").

**38.** *City of New York v. Exxon Corp.,* 932 F.2d 1020, 1025 (2d Cir.1991).

**39.** *See JewelAmerica v. Frontstep Solutions Group, Inc.,* No. 02 Civ. 1328, 2002 WL 1349754, at *1 n. 1 (S.D.N.Y. June 20, 2002) ("The bulk of the precedent in this circuit is that the first filed rule is usually disregarded where the competing suits were filed only days apart."); *Mackey v. Durham,* No. 00 Civ. 4721, 2000 WL 1191105, at *2 (S.D.N.Y. Aug.22, 2000) ("Courts in this district have shown little regard to dates of filing when

a court may nonetheless depart from the general rule if the balance of convenience favors proceeding in the second forum.[40] The first-filed rule should not be applied mechanically. As noted in *Everest Capital Ltd. v. Everest Funds Mgmt., LLC,* "[a]mple discretion is left to the lower courts in administering multifaceted litigation; courts are not to apply rules rigidly or mechanically." [41]

### 1. This Court Will Decide Whether the First–Filed Rule Applies

■ As an initial matter, Raytheon argues that "the court in Massachusetts should be allowed to determine the applicability of the first-filed rule." [42] For support, Raytheon relies on *MSK Ins., Ltd. v. Employers Reinsurance Corp.,* where the court stated, "This District has laid down a bright-line rule for situations such as this: The court before which the first-filed action was brought determines which forum will hear the case." [43] Such a rule is intended to avoid confusion · and conflict among the various federal courts.[44]

Raytheon's reliance on *MSK* is misplaced. *First,* unlike the actions brought in *MSK,* this case involves the question of whether this dispute, allegedly arising under the Payment Agreement, is subject to arbitration.[45] Thus, the question is not which court will resolve the underlying dispute, but which court will determine whether the arbitrators should make the threshold inquiry as to arbitrability. *Second,* the *MSK* case represents the paradigmatic first-filed dispute—that in which one party files first in one district and her adversary files in a different district. But here *Raytheon* filed the complaints in both districts. *Third,* while the rule articulated in *MSK* is *generally* followed, where circumstances have warranted deviation, courts in this district have departed from the rule.[46]

actions are brought within days of one another.") (quotation marks omitted).

**40.** *See Transatlantic Reinsurance Co. v. Continental Ins. Co.,* No. 03 Civ. 3227, 2003 WL 22743829, at *3 (S.D.N.Y. Nov.20, 2003). Relevant factors mirror those typically used to evaluate the propriety of venue transfer.

**41.** 178 F.Supp.2d 459, 463 (S.D.N.Y.2002).

**42.** Pl. Mem. at 10 n. 7.

**43.** 212 F.Supp.2d 266, 267 (S.D.N.Y.2002). *MSK* involved parallel actions filed in two federal district courts. The first action was filed by plaintiff Employers Reinsurance Corp. in the district court for the District of Kansas; the second was filed by the defendant in the first action, MSK Insurance Ltd., in the Southern District of New York. Both actions involved a dispute over the correct interpretation of a Reinsurance Certificate. *See id.* at 266–67.

**44.** *See Pem Am., Inc. v. Lambert,* No. 03 Civ. 3706, 2003 WL 22383369, at *2 (S.D.N.Y. Oct.17, 2003) ("In order to avoid conflict and confusion, the courts of this district ... have adopted the bright-line rule that the court in

which the first action was filed has the right and responsibility to decide whether the first filed rule or an exception thereto applies.").

**45.** *See* Payment Agreement at 11.

**46.** For instance, the court in *Everest Capital Ltd.* stated:

These questions would ordinarily be addressed by the court in which the "first-filed" case is pending. *See Citigroup, Inc. v. City Holding Co.,* 97 F.Supp.2d 549, 556 n. 4 [ (S.D.N.Y. May 31, 2000) ]. However, ... this Court is currently the only one with all of the relevant parties before it. At the core of the first-filed rule is the principle of sound judicial administration. *See First City Nat'l Bank & Trust Co. v. Simmons,* 878 F.2d 76, 80 (2d Cir.1989) ("The first to file rule embodies considerations of judicial administration and conservation of resources.").

178 F.Supp.2d at 464 n. 3. *But see Pem Am., Inc.,* 2003 WL 22383369, at *2 ("Although this bright-line rule is largely identical to and rooted in the first filed rule, it does not provide for any special exceptions. It is a straight-forward rule to be applied in a rote manner.").

There is no reason to defer to the Massachusetts court in this action. Judicial efficiency mandates that the matter be decided at the *earliest* possible time. Raytheon filed in both courts, demonstrating its concern over whether the Massachusetts court has the power to grant the requested relief. In so doing, Raytheon essentially mooted the concept of deferring to *plaintiff's choice* of forum as it is the plaintiff in *both* actions. Finally, given this Court's conclusion that the arbitrators will decide the threshold issue of arbitrability,[47] it is unlikely that either the Massachusetts court or this Court will address the issues raised in the underlying dispute.

### 2. Application of the First–Filed Rule

■ Raytheon argues that "the court in the district where an action is first-filed has priority to consider arbitrability, even if the second-filed action is pending in the district where arbitration would take place."[48] In other words, Raytheon argues that this Court should defer to the Massachusetts court under the first-filed rule, despite the fact that because the arbitration is to be held in New York, the Massachusetts court may lack authority to decide the issues.

Contrary to Raytheon's contentions, several circumstances justify departure from the first-filed rule.[49] *First,* because the Massachusetts action was filed only two days before the New York action, the filing dates lack significance and may be disregarded. *Second,* while the authority to decide issues regarding arbitration is certain in New York, it may be lacking in Massachusetts.[50] It would be a waste of

---

**47.** *See infra* Part III.B.

**48.** Pl. Mem. at 8. For support, Raytheon relies on a footnote in the Eighth Circuit's decision in *Keymer v. Management Recruiters Int'l, Inc.*, 169 F.3d 501, 503 n. 2 (8th Cir.1999). *See* Pl. Mem. at 8. Even assuming *Keymer* represents the law of this Circuit, *Keymer* is distinguishable on several grounds. *First,* in *Keymer,* the court specifically stated that "[i]n cases of concurrent jurisdiction, the first court in which jurisdiction attaches has priority to consider the case as a matter of federal comity." *Keymer,* 169 F.3d at 503 n. 2. In *Keymer,* both courts clearly had jurisdiction over the parties and the dispute. By contrast, while the jurisdiction of the Massachusetts court to stay or compel arbitration is uncertain, this Court clearly has authority to act. *Second,* in *Keymer,* the district court where the action was first filed denied the requested stay of arbitration on the ground that the dispute was not arbitrable. *After the decision was issued,* the second district court "proceeded to decide the same arbitrability question contrary to the principles underlying the first-filed rule." *Id.* Thus, the second court directly contradicted the mandate of another district court by issuing its opinion. Accordingly, the appellate court rejected appellant's argument that the second court had priority.

**49.** Although Raytheon is the plaintiff in both courts, it has expressed a clear preference to have the matter decided in Massachusetts, citing that court's familiarity with the insurance program and disputes between these parties arising under that program. It describes the New York filing as merely a protective action.

**50.** Because I conclude that this Court should decide whether the arbitration should proceed, I need not definitively determine whether the Massachusetts court also has the authority to address this issue. Neither party disputes that a New York court has the authority to decide the question of arbitrability where New York is the arbitral forum designated by the parties in their agreement. The authority of the Massachusetts court is less certain. There is conflicting authority regarding the power of a court located outside the district in which the arbitration is to be held to stay arbitration. Raytheon points to the Ninth Circuit's decision in *Textile Unlimited, Inc. v. A..BMH and Co.*, 240 F.3d 781 (9th Cir.2001). *See* Pl. Mem. at 11–15. The Ninth Circuit found that "nothing in the [FAA] requires that Textile's action to enjoin arbitration be brought in the district where the contract designated the arbitration to occur." *Textile Unlimited,* 240 F.3d at 784. *But see Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Lauer,* 49 F.3d 323, 328 (7th Cir.1995) (finding that a district court lacks the authority to

judicial resources to send the parties back to Massachusetts to litigate the question of judicial authority. Moreover, it would undoubtedly delay a final disposition in this matter. *Third,* as National Union argues, *it could not have filed first* because it was required to serve a demand for arbitration prior to commencing litigation, and had to wait twenty days following the demand before moving to compel arbitration.[51] It would contravene the policies embodied in the FAA [52] to penalize the party seeking to compel arbitration in accordance with the terms of an arbitration agreement. The first-filed rule is a technical rule relating to the conservation and efficient allocation of judicial resources. There is no basis for this Court to mechanically apply the rule in direct contravention of the overriding policy favoring the speedy resolution of disputes regarding arbitrability.

## B. Arbitrability of the Dispute

Pursuant to the FAA, the role of courts evaluating arbitration agreements is " 'limited to determining two issues: i) whether a valid agreement or obligation to arbitrate exists, and ii) whether one party to the agreement has failed, neglected or refused to arbitrate.' " [53] "In addressing these issues, courts are mindful that arbitration is a matter of contract, and that parties cannot be compelled to arbitrate issues that they have not specifically agreed to submit to arbitration." [54] Although the question of arbitrability is "determined by state law ... under the FAA, certain presumptions inform the analysis. Specifically, the federal policy in favor of arbitration requires that 'any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.' " [55]

---

compel arbitration if the arbitration is to be held in another district); *Roe v. Gray,* 165 F.Supp.2d 1164, 1173 (D.Colo.2001) ("Based on the combined statutory requirements of a geographic link between the arbitration site and the district which compels arbitration and because the court must respect the terms of the parties' arbitration agreement, the majority of courts have concluded that when the location of arbitration is contained in the arbitration agreement, the statute limits the fora in which motions to compel can be brought."). There is no governing law on this point in this Circuit. *See, e.g., Indian Harbor Ins. Co. v. Global Transp. Sys.,* 197 F.Supp.2d 1, 2 (S.D.N.Y.2002) ("The Court of Appeals for the Second Circuit has not yet decided how a district court should proceed when a suit pending before it involves an arbitration agreement which specifies that arbitration should take place outside the court's district."). Similarly, neither party cites controlling case law from the First Circuit.

**51.** *See* Tr. at 22–23; Def. Mem. at 13–14. *Cf. Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 22, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983) (evaluating a conflict between state and federal court and finding that "[i]n the federal suit ... the parties had

taken most of the steps necessary to a resolution of the arbitrability issue. In realistic terms, the federal suit was running well ahead of the state suit at the very time that the District Court decided to refuse to adjudicate the case. This refusal to proceed was plainly erroneous in view of Congress' clear intent, in the Arbitration Act, to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible.").

**52.** "The [FAA] establishes a liberal policy in favor of arbitration...." *Cicchetti v. Davis Selected Advisors,* No. 02 Civ. 10150, 2003 WL 22723015, at *1 (S.D.N.Y. Nov.17, 2003) (quoting *Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.,* 117 F.3d 655, 665 (2d Cir.1997)).

**53.** *Shaw Group Inc. v. Triplefine Int'l Corp.,* 322 F.3d 115, 120 (2d Cir.2003) (quoting *PaineWebber Inc. v. Bybyk,* 81 F.3d 1193, 1198 (2d Cir.1996)).

**54.** *Id.* (quotation marks and citations omitted).

**55.** *Id.* (quoting *Moses H. Cone Mem'l Hosp.,* 460 U.S. at 24–25, 103 S.Ct. 927).

■■ "An important exception applies, however, when the doubt concerns who should decide arbitrability." [56] As a general rule, "[t]he question whether the parties have submitted a particular dispute to arbitration, *i.e.*, the '*question of arbitrability*,' is 'an issue for judicial determination [u]nless the parties *clearly and unmistakably* provide otherwise.' " [57] "[T]he parties themselves may provide that the arbitrator, not the court, shall determine whether an issue is arbitrable." [58]

The question squarely presented here is whether Raytheon and National Union agreed that the arbitrators should decide whether disputes arising under the Master Policy are arbitrable. Because National Union is seeking to have the arbitrators decide arbitrability, rather than the court, it must demonstrate the parties intent by " 'clear and unmistakable evidence' from the arbitration agreement, as construed by the relevant state law." [59] The Second Circuit has cited the following principles of New York contract law to guide courts in determining whether an arbitration provision "clearly and unmistakably" demonstrates that arbitrators rather than the courts are to resolve questions of arbitrability:

(1) "[i]n interpreting a contract, the intent of the parties governs;" (2) "[a] contract should be construed so as to give full meaning and effect to all of its provisions;" (3) words and phrases in a contract should be "given their plain meaning;" and (4) ambiguous language should be construed against the interest of the drafting party. [60]

### 1. Deciding Arbitrability Under the Payment Agreement

The Payment Agreement plainly reveals the parties' intent to submit all disputes "aris[ing] about this agreement *or any transaction relat[ing] to it*" to arbitration. [61] This is indisputably a broad arbitration clause. In addition, the arbitration clause expressly delegates the issue of arbitrability to the arbitrators, specifically stating that "[t]he arbitrators . . . will have exclusive jurisdiction over the entire matter in dispute, *including any question as to its arbitrability.*" [62]

The broad arbitration clause is limited only by the requirement that the dispute arise out of the Payment Agreement or any related transaction. [63] Raytheon argues that the instant dispute concerning claims under the Master Policy does not fall within the arbitration clause, as it re-

**56.** *Id.*

**57.** *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002) (quoting *AT & T Techs., Inc. v. Communications Workers*, 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) (emphasis added)); *see also Shaw Group Inc.*, 322 F.3d at 121.

New York law follows the same rule, i.e., it acknowledges the "well settled proposition that the question of arbitrability is an issue generally for judicial determination," but at the same time recognizes an "important legal and practical exception" when parties "evince[ ] a 'clear and unmistakable' agreement to arbitrate arbitrability".

*Id.* (quoting *Smith Barney Shearson Inc. v. Sacharow*, 91 N.Y.2d 39, 45–46, 666 N.Y.S.2d 990, 689 N.E.2d 884 (1997)).

**58.** *PaineWebber Inc.*, 81 F.3d at 1198.

**59.** *Id.* at 1198–99. The Payment Agreement is governed by New York law. *See* Payment Agreement at 11.

**60.** *Shaw Group Inc.*, 322 F.3d at 121 (quoting *PaineWebber Inc.*, 81 F.3d at 1199–1200).

**61.** Payment Agreement at 10 (emphasis added).

**62.** *Id.* at 11 (emphasis added).

**63.** *Id.* at 10.

lates to *coverage* under insurance policies issued by National Union, rather than Raytheon's *payment* obligations under the Payment Agreement.[64] National Union, however, points out that "this dispute is a reimbursement dispute, [which] is at the heart of what the Payment Agreement is all about."[65] This is a classic question of the arbitrability of the issues raised in the Demand for Arbitration. Here, that question must be resolved by the arbitrators.

 Raytheon does not dispute the plain meaning of the arbitration agreement, but contends that because the Master Policy, which was executed four years before the Payment Agreement, did not itself contain an arbitration clause, disputes relating to the Master Policy are not covered under the arbitration provision.[66] National Union counters that "an arbitration clause can be adopted after the fact" and "in 1998 [Raytheon and National Un-

ion] agreed to arbitrate all disputes under [the Master Policy]."[67]

Raytheon's argument fails for several reasons. *First,* the Payment Agreement does not contain any temporally qualifying language, indicating that the parties intended for all disputes relating to the Payment Agreement, even those relating to policies incorporated in but predating the Payment Agreement, to fall within the arbitration provision.[68] This interpretation is particularly appropriate because a broad arbitration clause presumes that all disputes are arbitrable. *Second,* the fact that the Payment Agreement postdates the Master Policy cannot invalidate the parties' unambiguous agreement to arbitrate disputes relating to the constellation of policies incorporated into the Payment Agreement by the attached Schedule. The Payment Agreement specifically covers certain policies, which are defined as "any or all insurance policies *described by their*

64. *See* Pl. Mem. at 15–21.

65. Def. Mem. at 20.

66. *See* Pl. Mem. at 3.

67. Tr. at 29 (statement of Michael Davis, National Union's counsel).

68. *Cf. Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l, Inc.,* 198 F.3d 88, 99 (2d Cir.1999) ("SCI's argument that its claims against Enron concern events that predate the 1994 Agreement does not persuade us that the district court erred here in ordering arbitration. In *Coenen v. R.W. Pressprich & Co.,* 453 F.2d 1209, 1212 (2d Cir.1972), we held that arbitration ... applied to actions predating the signing of the contract by the petitioner because the contract stated that it governed 'any controversy' between the parties. As the arbitration clause here similarly does not contain any temporal limitation, the relevant inquiry is whether SCI's claims 'relat[e] to any obligation or claimed obligation under' the 1994 Agreement, not when they arose. We think it is evident that SCI's claims in the Dominican Lawsuit fall within

this broad language."); *Ryan, Beck & Co. v. Fakih,* 268 F.Supp.2d 210, 224 n. 28 (E.D.N.Y.2003) ("[W]here, as here, the arbitration clause did 'not contain any temporal limitation,' the Second Circuit has compelled arbitration despite the fact that the challenged conduct predated the signing of the parties' agreement."). In support of its position, Raytheon relies on *Peerless Importers, Inc. v. Wine, Liquor & Distillery Workers Union Local One,* in which the court found that the arbitration clause contained in a new collective bargaining agreement was too narrow "to cover disputes arising before the agreement was executed, unless such preexisting disputes are brought within the scope of the clause." 903 F.2d 924, 928 (2d Cir.1990). But in *Peerless Importers, Inc.,* the court did not believe that the "arbitration clause of the new agreement [was] 'susceptible of an interpretation that covers the asserted dispute.'" *Id.* (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582–83, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)). By contrast, the arbitration clause contained in the Payment Agreement is very broad, and the Master Policy is specifically incorporated on the Schedule to the agreement.

*policy numbers in the Schedule,* and their endorsements, modifications, replacements and renewals." [69] The Master Policy is listed on the attached Schedule. Raytheon argues that the parties agreed that the Payment Agreement would not be applied retroactively.[70] But this contention is belied by the plain language of the Payment Agreement and the attached Schedule. Accordingly, the intent of the parties to include the Master Policy under the terms of the Payment Agreement is clear solely on a review of the Payment Agreement and the attached Schedule.

While there may be merit to Raytheon's assertions that the parties agreed that the Payment Agreement would *not* be applied retroactively, this is a dispute for the arbitrators to resolve. In the absence of ambiguity in the Payment Agreement and the Schedule, Raytheon cannot introduce extrinsic evidence *to this Court* contradicting the language of the contract requiring that the issue of arbitrability be decided by the arbitrators.[71] However, it may be appropriate for the arbitrators to consider extrinsic evidence when deciding the question of arbitrability. Raytheon argues, for example, that Erik Eckilson, the Relationship Manager for Raytheon in connection with the insurance agreements between Raytheon and National Union, testified that the parties had always agreed that

the Payment Agreement would *not* be applied retroactively.[72] Raytheon also claims that an earlier "black-lined" version of the Payment Agreement expressly reveals that the Master Policy would not be incorporated into the Payment Agreement.[73] The arbitrators will undoubtedly resolve this dispute when addressing the question of arbitrability.

### 2. 93A Claims

Raytheon asserts that requiring it to arbitrate would deny it "meaningful relief" for National Union's violations of Massachusetts Law.[74] Specifically, Raytheon argues that:

> National Union's voluntary, unilateral settlement of third party claims without Raytheon's consent; its failure to inform Raytheon of facts material to its alleged exposure; and its extortionate tactics in threatening to draw and then wrongfully drawing upon Raytheon's letter of credit ... constitute unfair insurance practices and justify an award of multiplied damages under [Mass. Gen. Laws ch. 93A § 11 (2003) ].[75]

Because the parties conferred authority on the arbitrators to assess the arbitrability of the dispute, this argument warrants only brief discussion. Even if the Pay-

---

69. Payment Agreement at 4.

70. *See* Pl. Mem. at 3.

71. *See, e.g., Loewenson v. London Mkt. Cos.,* 351 F.3d 58, 61 (2d Cir.2003) ("[A]n unambiguous agreement must be construed according to its terms without resort to extrinsic evidence."); *British Int'l Ins. Co. v. Seguros LA Republica, S.A.,* 342 F.3d 78, 82 (2d Cir. 2003) ("Where ... the contract is clear and unambiguous on its face, the intent of the parties must be gleaned from within the four corners of the instrument, and not from extrinsic evidence.") (quoting *Rainbow v. Swisher,* 72 N.Y.2d 106, 109, 531 N.Y.S.2d 775, 527 N.E.2d 258 (1988)).

72. *See* 1/5/04 Letter from Peter N. Wang, Raytheon's counsel to the Court; *see also* 11/17/03 Affidavit of Erik Eckilson in Support of Raytheon's Motion for Preliminary Injunction Filed in District Court in Massachusetts.

73. *See* Black-lined Payment Agreement, Ex. H to Davis Decl.

74. Memorandum of Law in Support of Raytheon's Motion for Preliminary Injunction filed in the District Court of Massachusetts at 16.

75. *Id.* at 17.

ment Agreement does not permit the arbitrators to award multiplied damages,[76] the Payment Agreement appears to reflect the agreement of the parties. Indeed, the Payment Agreement specifies that (1) the laws of New York, not Massachusetts, govern disputes arising from the agreement, and (2) the parties agreed to waive exemplary or punitive damages as to these disputes. The arbitrators must decide whether this limitation was agreed to by the parties and must also decide whether the agreement to arbitrate, with this limitation, is void based on considerations of public policy.

### 3. Waiver of Arbitration Rights

 Finally, Raytheon argues that "National Union has waived any right to arbitrate the issues in dispute."[77] Specifically, Raytheon contends that National Union waived its arbitration rights by failing to demand arbitration for two years following Raytheon's alleged default under the Master Policy[78] and by participating in "protracted litigation of substantive issues central to the merits of the underlying dispute."[79] "[O]rdinarily a defense of waiver brought in opposition to a motion to compel arbitration ... is a matter to be decided by the arbitrator."[80] However, the district court may reach the question of waiver where the party seeking arbitration "had previously participated in court proceedings to litigate the same dispute."[81] Although Raytheon argues that National Union participated in litigation of matters "central to the merits" of the present dispute, the prior litigation did not involve the same parties, nor were these prior actions brought pursuant to the Payment Agreement.[82] Because it does not appear that National Union previously participated in court proceedings to litigate the issues raised here by Raytheon, the question of whether National Union waived its right to arbitrate must be decided by the arbitrators.

## IV. CONCLUSION

For the foregoing reasons, National Union's motion to compel arbitration is granted. National Union's motion to enjoin Raytheon from the prosecution of parallel litigation in Massachusetts is denied. Accordingly, Raytheon's request that this Court: (1) "defer ruling on National Union's motion" pending disposition of Raytheon's motion in the Massachusetts action; (2) stay arbitration pending disposition of the Massachusetts action; and (3) deny National Union's motion to compel because National Union has waived its right to demand arbitration, is denied. The parties are directed to pro-

---

**76.** The Payment Agreement states that the arbitrators "will not have the power to award exemplary damages or punitive damages, however denominated, whether or not multiplied, whether imposed by law or otherwise." Payment Agreement at 11.

**77.** Pl. Mem. at 21.

**78.** See id. at 21–24.

**79.** Id. at 23.

**80.** Bell v. Cendant Corp., 293 F.3d 563, 569 (2d Cir.2002) (quoting S & R Co. of Kingston

v. Latona Trucking, Inc., 159 F.3d 80, 82–83 (2d Cir.1998)).

**81.** Doctor's Assocs., Inc. v. Distajo, 66 F.3d 438, 456 (2d Cir.1995).

**82.** See Pl. Mem. at 6 ("Ratheon filed a motion to intervene in the WGI lawsuit.... Judge Lindsay denied Raytheon's motion."); see also Tr. at 37 (statement of Michael Davis, National Union's counsel) (noting Raytheon's unsuccessful attempt to intervene in the earlier litigation between the WGI Companies and National Union).

ceed to arbitration on the terms specified in the Payment Agreement.